UNITED STATES of America,
Plaintiff–Appellee,

v.

Christopher L. BELL,
Defendant–Appellant.

No. 90–1284.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1990.

Decided July 10, 1991.

**338**

Mel S. Johnson, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Michael L. Chernin, Milwaukee, Wis., for defendant-appellant.

Before COFFEY and KANNE, Circuit Judges, and GRANT, Senior District Judge.*

COFFEY, Circuit Judge.

Defendant-appellant Christopher L. Bell appeals his conviction for money laundering in violation of 18 U.S.C. § 1956(a)(1), alleging that his placing of money in a safety deposit box in a financial institution cannot constitute the crime of laundering money instruments. *See* 18 U.S.C. § 1956. The defendant also appeals his conviction for conspiracy to distribute cocaine base and with using a juvenile to accomplish this end. We reverse his conviction on the money laundering counts and affirm his conviction on the drug counts.

## I. FACTS AND PROCEEDINGS BELOW

On September 19, 1989, the defendant was indicted on six counts: Count One charged the defendant with conspiring to distribute 50 grams or more of cocaine base (the statutory name for the drug more widely known as "crack") in violation of 21 U.S.C. § 846 from February 1, 1989, to August 24, 1989; Count Two charged the defendant with knowingly and intentionally using a juvenile to distribute cocaine base in violation of 21 U.S.C. § 845(b); Counts Three through Six charged the defendant with money laundering in violation of 18 U.S.C. § 1956(a)(1) based upon his placing of cash into, removing of cash from, and transfers of cash between, safe deposit boxes located at The First Wisconsin National Bank, Capitol Court Branch, Milwaukee, Wisconsin. Prior to trial, the defendant moved to dismiss the money laundering counts arguing that the placing of money and the removing of money from a safe deposit box in a bank does not constitute the laundering of money instruments in violation of 18 U.S.C. § 1956. The district court denied this motion.

At trial, the government presented evidence of the defendant's crack dealing conspiracy, as well as documentation of the defendant's use of safe deposit boxes he leased at the First Wisconsin National Bank. The government presented evidence at trial which revealed that the defendant oversaw the operations of several "crack houses" in the City of Milwaukee.[1] Vandall Griffen, a juvenile employed by the defendant to sell crack, testified that he worked at 2048 N. 32nd Street in Milwaukee selling crack for the defendant and observed other juveniles also selling crack at that location for the defendant. He also testified that he was present when the defendant made deliveries of crack to the premises with an associate named Willie Pitmann. The government also presented the testimony of Raymond Howard, a crack customer who testified that the defendant asked him to assist him in his crack dealing operation. Based on their direct dealings with the defendant, Griffen and Howard testified that the defendant, along with Willie Pitmann, supplied the drug to the crack houses, picked up the money from the sales at the houses, employed juveniles

---

* Honorable Robert A. Grant, of the Northern District of Indiana, sitting by designation.

1. Crack is a cheaper, more addictive form of cocaine.

to sell the crack, and beat (and in some cases burned) those juveniles for allegedly keeping a portion of the proceeds. In addition, the defendant's neighbor, Donetta Thomas, testified that she had purchased crack from the defendant and his girlfriend six or seven times in the spring of 1989.

After a police raid at the 2048 N. 32nd Street crack house, the defendant moved his drug operation to 2111 N. 32nd Street. Howard and Griffen testified that this house was operated by the defendant Bell. A number of Milwaukee police officers testified to various undercover purchases of crack at the 2111 N. 32nd Street address. In addition, the defendant, while under police surveillance, was observed entering and exiting from the house at this address at various times. Moreover, Griffen testified the defendant had other juveniles selling for him in the rear of the house and testified that he had been present when drug deliveries were made to the house by the defendant and/or Willie Pitmann.

On several occasions, police officers went through the trash left behind the defendant's residence at 4831 N. 39th Street in Milwaukee. In the defendant's trash container, the police officers found a plastic wrapper with brown plastic tape of the kind commonly used as a wrapper for a kilogram of cocaine. The wrapper contained a white powder which tested positive for the presence of cocaine. Also found in the defendant's trash container were a number of plastic bags containing cocaine residue. In addition, three empty one-pound boxes of baking soda were found.[2] On August 8, 1989, the defendant's residence at 4831 N. 39th Street was searched by police officers pursuant to a warrant. The officers found dozens of small foil packets of a kind and size consistent with the packets used for the packaging and distribution of crack. Also found was an electric scale calibrated in grams with co-caine base residue as well as two dinner plates with cocaine base residue. An additional box of baking soda was found as well as keys for the safe deposit boxes. Some particles of crack were found along with a number of test tubes which could be used to cook crack, a bottle of inositol (a common cutting agent for cocaine), and a publication listing radio frequencies including the Milwaukee Police Department's frequencies.[3]

Rita Patel, a safe deposit clerk at The First Wisconsin National Bank, testified about the defendant's visits to his two safe deposit boxes. Patel testified that on May 22, 1989, the defendant took money from his safe deposit box and placed it in a plastic bag, and left the bank stating that he was going to a car lot. Patel testified that to her knowledge she had never seen a customer use a safe deposit box for purposes of storing money. On June 5, 1989, Patel saw the defendant place a large ball of money wrapped in a rubber band into his safe deposit box. On June 7, 1989, she noticed that the defendant took a plastic bag of money containing hundred dollar bills out of the box. On June 14, 1989, Patel again noticed that the defendant came into the bank with a plastic bag full of hundred dollar bills. Finally, on July 14, 1989, Patel recalled that the defendant switched boxes and transferred four or five rubber banded wads of currency from one safe deposit box to another. In a later search by the Internal Revenue Service conducted pursuant to a valid search warrant, approximately $5,000 in banded stacks of currency were found in the defendant's safe deposit box. Defense counsel stated in his opening statement and in his trial brief that the defendant was in the business of selling automobiles that he had repaired. Counsel proffered this statement as an explanation for the source of the

---

**2.** The process of making crack requires combining equal amounts of cocaine and baking soda which is then cooked in boiling water which boils off the hydrochloride salts in the cocaine, leaving cocaine base or "crack".

**3.** Also discovered were an electronic scanner to monitor the police frequencies and seven fire-arms, six being fully loaded and including four handguns, a shotgun, a rifle, and a semi-automatic assault weapon. There were also a number of boxes of ammunition for all of the weapons as well as photographs of the defendant holding the guns in various poses.

money the defendant stored in his safe deposit box. The defendant, while under surveillance by various officers on more than fifteen occasions, was never observed traveling to or from any place of employment. In addition, a search of his residence and garage failed to uncover any tools for automotive work nor were there any records of an automotive business.

Thomas Spitz, the customer service manager for the Capitol Court Branch, also testified. He stated that the safe deposit boxes are storage facilities only and the contents of the boxes neither earn interest nor are they insured. He also stated his opinion that placing money into or removing money out of safe deposit boxes is not regarded as a bank transaction in the same way as a savings or checking deposit. He further testified that the use of the safe deposit boxes does not involve entries or records of deposits, withdrawals, or balances as would be created for a regular bank account.

At the close of the evidence, the district court gave the jury the jury instructions involving the elements of the money laundering charges. The jury subsequently found the defendant guilty on Counts One through Five: Count One, conspiracy to distribute cocaine base; Count Two, knowingly employing a juvenile to distribute cocaine; and Counts Three through Five, removing and transferring drug proceeds in the form of currency from and between safe deposit boxes located in a financial institution. The defendant was found not guilty on Count Six, placement of money into safe deposit boxes located in a financial institution. The defendant received concurrent terms of imprisonment of 40 years on Counts One and Two, and 20 years on Counts Three through Five, (to run concurrent with Counts One and Two), to be followed by a 10 year supervised release plus $250 in mandatory special assessments.

## II. ISSUE FOR REVIEW

On appeal, the defendant contends the trial court erred in failing to dismiss Counts Three through Five because the alleged violation of 18 U.S.C. § 1956(a)(1)(B)(i) was based upon deposits into and withdrawals from a safe deposit box. The defendant specifically argues that his deposits of cash into and his withdrawals of cash out of his safe deposit boxes at the First Wisconsin Bank do not constitute money laundering as defined in § 1956.

## III. DISCUSSION

■ The issue before us is whether placing proceeds (money) from drug sales in a safe deposit box is a violation of § 1956, the money laundering statute. Our review is a matter of first impression because neither the government nor the defendant has cited any case law either supporting or casting doubt on the interpretation that movement of funds into and out of safe deposit boxes is money laundering, nor have we been able to locate any precedent. Furthermore, our review focuses on a legal issue and is therefore *de novo*. *United States v. Fox*, 845 F.2d 152, 153 (7th Cir. 1988) *cert. denied*, 488 U.S. 1012, 109 S.Ct. 800, 102 L.Ed.2d 791 (1989).

Initially we begin with the relevant portions of § 1956:

**"Laundering of monetary instruments**

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

"(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

"(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

"(B) knowing that the transaction is designed in whole or in part—

"(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

"(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

\* \* \* \* \* \*

"(c) As used in this section—

\* \* \* \* \* \*

"(3) the term 'transaction' includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;"

In our review we focus on the question of whether placing money in a safe deposit box located within a financial institution constitutes a "transaction" as defined in § 1956(c)(3).

Our review of statutory construction is well established:

"We first must determine 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court ... must give effect to the unambiguously expressed intent of Congress.'" *Abercrombie v. Clarke*, 920 F.2d 1351, 1356–57 (7th Cir. 1990) (quoting *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)).

Unfortunately, the final passage of this statute and its amendments are unaccompanied by legislative history to assist us in our analysis. Nonetheless, "[t]he words of the statute, not the words of the legislative history, control statutory interpretation." *Davel v. Sullivan*, 902 F.2d 559, 562 (7th Cir.1990). This court has previously stated that the language of the statute is the most

reliable indicator of congressional intent: "It is that language which is chosen with the most care, subjected to the greatest scrutiny and actually voted on by Congress and signed by the President." *Monterey Coal Company v. Federal Mine Safety and Health Review Commission*, 743 F.2d 589, 595–96 (7th Cir.1984). Therefore, we begin our analysis with an examination of the language of § 1956.

Section 1956(c)(3) states that the term "transaction" with respect to a financial institution refers to a "deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, or any other payment, transfer, or delivery by, through, or to a financial institution by whatever means effected." The government states in support of its argument that "transaction" should be broadly interpreted, and that its use was "obviously meant to include all manners of monetary transactions in or out of financial institutions." The defendant meanwhile argues that "placing money in, or removing money from, a safe deposit box does not fall within the operational definition of a 'transaction' as defined in [the statute]." We agree with the defendant.

Congress' use of specific financial terms that involve the placing of money into a bank's possession reveals its intent to limit the meaning of "transaction" to only those activities where the bank actually retains control over a customer's funds. We have been unable to discover a clearly expressed legislative intent to include this type of service provided by a financial institution to be considered a "transaction." If Congress had intended all services offered by a financial institution to its customers to be considered a "transaction" it could have said so. Congress did not and therefore this court can only interpret Congress' intent from the very words of the statute. Certainly, the placing of money and/or withdrawing of money from a safe deposit box where no record is made and no interest is paid on the amount of money in the box cannot be considered a "banking transaction."

The defendant's use of safe deposit boxes at the First Wisconsin National Bank does not fall within the scope of "transaction" as set forth in § 1956(c)(3) because his use of the boxes cannot be considered a "transfer between accounts, an exchange of currency, a loan, an extension of credit, a purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument. . . ."

Further, the defendant's use of the safe deposit boxes does not constitute: (1) *a payment*—no payment of any kind was made. The defendant simply put his money into a box for safekeeping and/or storage purposes. The money in the safe deposit box was not put there to make any type of payment to First Wisconsin; (2) *a transfer*—a transfer as used in the context of banking is generally defined as the "moving funds from one account to another, as from checking to savings . . . [and] moving stocks, bonds, or other securities from one owner to another, and recording the change of ownership on registration papers." *Barron's Dictionary of Banking Terms* (1st ed.1990). The defendant's use of the First Wisconsin's safe deposit boxes for the purposes of safekeeping and/or storage of money was clearly not a transfer because the defendant did not convey any right, title, or interest in the money to the bank. The money was stored in the box only until such time as the defendant chose to remove it.[4] At all times, the defendant retained his ownership to the money in the safe deposit box; (3) *a delivery*—Barron's defines "delivery" as the "[p]resentment of a check or negotiable instrument, endorsed by the payee, to the paying bank." Certainly, the defendant's use of First Wisconsin's safe deposit boxes does not constitute a delivery because, as pointed out earlier, use of the safe deposit boxes did not involve any records of deposits, withdrawals, or balances as would be created for a regular bank account. More-

over, the contents did not earn interest nor were they insured.

Finally, the defendant's placing and removing of money into and from the safe deposit boxes cannot be classified as "deposits" or "withdrawals" as contemplated in § 1956(c)(3). Again, we believe the Congressional intent in the plain meaning of this section reveals that the terms "deposits" and "withdrawals" refer to activities through which a banking institution keeps records of and credits and debits an individual's savings or checking account. The defendant's placing and removing of money into and from the safe deposit boxes did not constitute deposits or withdrawals into a savings or checking account and, therefore, the defendant's activities do not constitute "deposits" and "withdrawals" as set forth in the statute.

"It is a maxim of statutory construction that, unless otherwise defined, words should be given their ordinary, common meaning." *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir.1984) *cert. denied*, 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985) (quoting *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979)). Moreover, when there is a dearth of legislative history on a statute, it "strongly reinforces the view that the [statute] means nothing more than its plain language implies." *Id.* Because the defendant's activities do not fall within any of the enumerated terms in § 1956(c)(3) which define "transaction," coupled with the absence of legislative history, we believe that the defendant's use of safe deposit boxes to store money does not constitute a "transaction" under the statute. Thus, his conviction on Counts Three through Five is reversed.

■ In the last section of his brief, the defendant makes a meritless attempt to justify a new trial on the remaining drug counts, contending that the money laundering counts tainted the drug counts, "be-

---

**4.** We fail to understand how the defendant's use of a safe deposit box at the First Wisconsin National Bank is any different from the use of a safe deposit box at an airport or bus terminal. In each situation, the individual with the key to the box has the unfettered ability to store what-

ever he or she desires, the contents of the box are uninsured, and no records of the contents are kept. The only distinguishing feature that brings the defendant's actions arguably within § 1956 is that the safe deposit box he was using was located in a "financial institution."

cause the appearance of attempting to conceal money, made it seem more likely that Bell was a drug dealer." Notwithstanding the feebleness of this argument, the defendant offers no analysis of the evidence to support his contention. This court has previously stated that "an issue expressly presented for resolution is waived if not developed by argument." *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988) (citing *Hunter v. Allis–Chalmers*, 797 F.2d 1417, 1430 (7th Cir.1986)). Moreover, "an appellant is required by Rule 28(a)(4) of the Federal Rules of Appellate Procedure to present in his brief to the appellate court the issues that he desires to litigate and to support his argument on those issues with appropriate judicial authority." *United States v. Brown*, 899 F.2d 677, 679 n. 1 (7th Cir.1990) (citing *Zelazny v. Lyng*, 853 F.2d 540, 542 n. 1 (7th Cir.1988)). Because of the defendant's failure to offer any substantive (much less legal) argument in either his appellate brief or oral argument in support of his contention that the money laundering counts "tainted the fairness of [his] trial," this argument is waived.[5]

## IV. CONCLUSION

The defendant's conviction and sentence of forty years on Counts One and Two for conspiring to distribute cocaine base and with using a juvenile to accomplish this end are affirmed. The defendant's conviction on Counts Three, Four and Five for money laundering are reversed.

---

**5.** Even if the defendant had supported his argument with analysis, this court would affirm his conviction on the drug counts given the overwhelming evidence presented by the government at trial documenting the defendant's role in the crack operation. The evidence of the defendant's guilt as to the drug offenses was so overwhelming that any minimal prejudice from the money laundering counts could not have affected the outcome on the drug counts.