**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Harold SAMOUR (92–3847) and
Shannon Roberts (92–3888);
Defendants–Appellants.**

Nos. 92–3847, 92–3888.

United States Court of Appeals,
Sixth Circuit.

Argued June 29, 1993.

Decided Nov. 12, 1993.

Bradley D. Barbin, Salvador A. Dominguez (argued and briefed), Office of the U.S. Atty., Columbus, OH, for plaintiff-appellee.

David J. Graeff (argued and briefed), Columbus, OH, for defendant-appellant, Harold Samour.

John S. Marshall (argued and briefed), Spater, Gittes, Schulte & Kolman, Columbus, OH, for defendant–appellant Shannon Roberts.

Before: KENNEDY and MARTIN, Circuit Judges; and FORESTER, District Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

Harold Samour and Shannon Roberts appeal their convictions and sentences for conspiracy to possess marijuana with the intent to distribute, in violation of 21 U.S.C. § 846. Samour also appeals his additional convictions for money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (B)(i); travelling in interstate commerce in aid of a racketeering enterprise, in violation of 18 U.S.C. §§ 1952 and 2; and possession of marijuana with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). We reverse Samour's conviction for money laundering but affirm his convictions on other counts. We affirm the convictions of Roberts but remand so that the district court may recalculate its conversion of cash into drugs to establish the quantity of marijuana sold and to resentence Roberts in light of this calculation.

Early in 1991, Jason Kraus and Shannon Roberts flew from Columbus, Ohio to Tuc-son, Arizona to pick up a large amount of marijuana at Harold Samour's request. After Roberts and Kraus checked into a hotel, a person named "Cha Cho" picked them up and brought them to a house in which Kraus saw twenty to thirty pounds of marijuana. Roberts gave Cha Cho $7,000 or $8,000 in cash. Kraus did not see the marijuana placed in the car that he and Roberts used to drive back to Columbus, but he was told that the marijuana was located in the side panels of the car. Kraus did not see the marijuana delivered to Samour.

On July 2, a Texas Highway Patrol officer stopped a car driven by Roberts because neither he nor his passenger, Samour's brother George, were using their seat belts. When asked for identification, George Samour opened a suitcase in the back of the car, and a small amount of marijuana fell out. Upon request, Roberts permitted the officer to search the vehicle. The officer did not locate any additional contraband, but he did find $30,000. George Samour said that the money belonged to him but did not attribute it to any illegal activities. Afterwards, the police released Roberts and George Samour.

In November, Harold Samour arranged for Darrin Reynolds to travel to Arizona to pick up a load of marijuana for delivery in Columbus, Ohio. Samour told Reynolds that others had brought marijuana from Arizona without complications and offered to pay Reynolds $10,000 for making the trip. Reynolds agreed to Samour's proposal. Samour gave Reynolds $20,000 in U.S. currency to bring on the trip. Samour told Reynolds to use $1,000 for travel expenses and to give $19,000 to Cha Cho as a down payment for the marijuana that Reynolds would receive.

On November 7, Reynolds arrived in Tucson and contacted Cha Cho. Reynolds paid Cha Cho $19,000 from the money provided by Samour, and Cha Cho loaded Reynolds' car with approximately 103 pounds of marijuana. Reynolds and Cha Cho's sister, Alexandria, then drove the car to Columbus and delivered the marijuana to Samour. Afterwards, Reynolds flew back to Arizona to

---

* The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

make an additional payment to Cha Cho. Samour and Alexandria taped $68,000 in U.S. currency to Reynolds' body before his flight to avoid detection. Reynolds returned to Ohio after delivering the money.

On November 22, Reynolds drove with Alexandria to Tucson from Columbus to deliver an additional $70,000 to Cha Cho from Samour. After returning home for Thanksgiving and picking up another $20,000 from Samour, Reynolds traveled to Arizona to give Cha Cho the money and to pick up another load of marijuana. Reynolds left Tucson with Alexandria on December 3 and was stopped the next day in Memphis, Tennessee for speeding. The police then conducted a canine search for drugs and found more than 100 pounds of marijuana. The police then asked Reynolds whether he wanted to assist the officers in making a controlled delivery to his accomplices. Reynolds agreed to cooperate. Reynolds met Samour, Roberts, and Kraus at a hotel in Columbus as planned while law enforcement officers monitored their conversation. The officers arrested Samour, Kraus, and Roberts after listening to them discuss the trip and the load of marijuana that Reynolds had brought to Ohio. During this conversation, Samour also mentioned that he needed to get his scales before the group reassembled. The marijuana seized from Reynolds' car at the time of the arrests weighed out at a hundred and one pounds.

On February 6, 1992, a federal grand jury indicted Roberts on charges of money laundering and conspiracy to possess marijuana with the intent to distribute. The grand jury also indicted Samour on the same two charges, as well as on charges of travelling in aid of racketeering and unlawful possession with intent to distribute marijuana. After a jury trial, Samour was convicted on all counts, and Roberts was convicted of conspiracy but acquitted of money laundering. On August 28, the district court sentenced Roberts to imprisonment for five years and three months. Samour was sentenced to imprisonment for eight years and one month with three years of supervised release and a $100,000 fine. Samour also received a five-year sentence on the interstate travel count

that is to run concurrent with his other sentence. Both Samour and Roberts filed timely appeals.

Samour challenges his convictions for money laundering under 18 U.S.C. § 1956. The four counts at issue arise from the successive payments to Cha Cho in the amounts of $20,000, $68,000, $70,000, and $20,000. Samour contends that the United States did not establish all of the requisite elements of a money laundering offense. We agree.

Samour's argument presents a question of the scope of Section 1956(a)(1). The specific question before us is whether transporting drug money concealed in an automobile or hidden on one's person constitutes a violation of sections 1956(a)(1)(A)(i) or (a)(1)(B)(i). Section 1956(a)(1) provides, in pertinent part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

. . . . .

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;

. . . . .

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for no more than twenty years, or both.

. . . . .

Subsection (c) defines some of the pertinent terms used in section 1956:

(c) As used in this section—

. . . . .

(3) the term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a

deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;

(4) the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

. . . . .

Sections 1956(a)(1)(A)(i) and (a)(1)(B)(i), which are the provisions under which Samour was charged, are targeted towards different activities. Subsection (a)(1)(A)(i) prohibits utilizing funds to promote an illegal activity; subsection (a)(1)(B)(i) prohibits concealing the proceeds of the illegal activity. *United States v. Jackson*, 935 F.2d 832, 842 (7th Cir.1991). In *Jackson*, a case involving subsection (a)(1)(A)(i), the Seventh Circuit held that there must be clear proof that the defendant entered a transaction knowing that the funds involved were derived from an unlawful activity and intended that the transaction further the criminal activity. *Id.* at 840.

A central focus of subsection (a)(1)(B)(i) is to criminalize the "conversion of cash into goods and services as a way of concealing or disguising the wellspring of the cash." *Id.* Under this subsection, the United States has the burden of proving beyond a reasonable doubt that the defendant "knowingly conducted a financial transaction with the proceeds of drug distribution and that he did so with the intent to conceal the nature or source of those proceeds or with the intent to avoid a transaction reporting requirement." *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir.1992) (citation omitted).

Both subsection (a)(1)(A)(i) and (a)(1)(B)(i) require that the perpetrator engage in a "financial transaction" as defined in section 1956(c)(4). Our present inquiry is whether transporting money concealed either in an automobile or on one's person is a "financial transaction." In the statutory definition of "financial transaction," section 1956(c)(4) lists many particular types of financial transactions, such as the purchase of boats, planes, and automobiles. "Transaction" is defined in section 1956(c)(3) to include "transfer, delivery, or other disposition." These statutory definitions do not address the specific situation before us. The district court considered Samour's activity to constitute "transaction[s] which . . . affect[ ] interstate or foreign commerce (i) involving the movement of funds . . . *by other means.*" 18 U.S.C. § 1956(c)(4) (emphasis added). We disagree.

The legislative history of section 1956 provides some indication of Congressional intent on the definitions of "financial transaction" and "transaction." Senate Report No. 99–433, which accompanied Senate Bill No. 2683 (containing the same language as "The Money Laundering Control Act of 1986" or Public Law 99–570), states:

> Section 1956(a)(1) is the basic money laundering offense.... This section ... appl[ies] its coverage to those transactions that can be said to constitute the core of money laundering—transactions designed to conceal or disguise the nature, location, source, ownership or control of criminal proceeds, or to evade Federal or State cash reporting requirements. This language is intended to include transactions designed to conceal the identity of the participants to the transaction, where it can also be proved that the funds involved in the transaction are in fact the proceeds of the crime.

In 1990, subsection (c)(4) was amended to clarify the extent of the statute's applicability. Section 1402 of the Crime Control Act of 1990 expanded the definition of "financial transaction" to include the transfer of title to real property, vehicles, boats, and airplanes. 137 Cong.Rec. 16,645 (1991). However, Congress did not specifically address the trans-

portation of currency in the 1990 amendments. Consequently, we find no legislative history indicating that Congress intended to apply the money laundering statute to the transportation of cash.

In interpreting section 1956, two circuits have restricted the scope of what constitutes a "transaction" or "financial transaction." *See United States v. Bell,* 936 F.2d 337, 341–42 (7th Cir.1991) and *United States v. Gonzalez–Rodriguez,* 966 F.2d 918, 926 (5th Cir. 1992). In *Bell,* 936 F.2d at 341, the Seventh Circuit held that Bell's placement of cash proceeds from drug sales in a safety deposit box at a bank was not a "transaction" within the meaning of section 1956(a)(1).[1] In *Gonzalez–Rodriguez,* 966 F.2d at 926, the Fifth Circuit held that transporting $8,000 in cash in a public airport was not a violation of section 1956(a)(1)(B)(i). We adopt this reasoning and find that merely transporting cash does not meet the definition of "financial transaction" for purposes of the money laundering statute. Therefore, the United States did not establish violations of sections 1956(a)(1)(A)(i) or (a)(1)(B)(i) because it failed to show anything other than the fact that Samour transported cash.

This conclusion is further supported by the fact that the mere transportation of funds is addressed elsewhere in the money laundering statute. Section 1956(a)(2) specifically addresses the transportation of funds as a separate, chargeable offense. Samour was neither charged with nor convicted of violating section 1956(a)(2), but a review of the scope of this subsection provides a valuable comparison to the subsections that Samour allegedly violated. Subsection (a)(2) provides in part:

> (2) Whoever transports, transmits, or transfers ... a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(A) with the intent to promote the carrying on of specified unlawful activity;

. . . . .

shall be sentenced to a fine of $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both.

In subsection (a)(2), Congress outlawed the physical transportation or wire transfer of tainted funds across United States borders. *See United States v. Monroe,* 943 F.2d 1007, 1015–16 (9th Cir.1991) (discussing the legislative history of this subsection). Subsection (a)(2) does not address transportation or wire transfer of tainted funds within the United States. We are reluctant to conclude that a physical transportation of money, whether it is domestic or international, constitutes a "financial transaction" within the meaning of section 1956(a)(1) because Congress specifically created a separate subsection for mere transportation of funds. Because no financial transaction within the meaning of the money laundering statute occurred in this case, we reverse Samour's convictions for money laundering with directions that these charges be dismissed.

Samour and Roberts also challenge the admission of hearsay statements made by alleged co-conspirators. Kraus and Reynolds, the alleged co-conspirators, testified about incriminating statements and acts involving Roberts and Samour. In *United States v. Enright,* 579 F.2d 980, 986 (6th Cir.1978), we held that before admitting a statement under Fed.R.Evid. 801(d)(2)(E), the co-conspirator exception to the hearsay rule, the prosecution must show the following elements by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the defendant against whom the hearsay is offered was a member of the conspiracy; and (3) that the hearsay statement was made in the course and in furtherance of the conspiracy. Both defendants contend that the district court failed to find that the statements by alleged co-conspirators were made during

---

**1.** In response to the *Bell* decision, Congress amended the definition of "transaction" in section 1956(c)(3) in 1992 by adding "use of a safe deposit box" to the part of the definition that dealt with transactions involving financial institutions.

and in furtherance of a conspiracy before allowing the co-conspirators to testify. In *United States v. Vinson*, 606 F.2d 149, 152–53 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), we described the district court's options in making the *Enright* findings: (1) requiring the prosecution to produce non-hearsay evidence before hearsay evidence; (2) holding a "mini hearing" outside the presence of the jury; or (3) admitting the statements on the condition that their admissibility must be demonstrated later by a preponderance of the evidence.

 Neither Samour nor Roberts objected during the trial to the admission of the hearsay statements by the alleged co-conspirators. Even though they did not preserve an objection, they argue that the district court committed plain error in admitting the statements. Samour and Roberts contend that the district court did not make a finding on the record that the statements were made during and in furtherance of a conspiracy before allowing the co-conspirators' testimony. We limit plain error "to those harmful ones that are so rank that they should have been apparent to the trial judge without objection, or that strike at the fundamental fairness, honesty, or public reputation of the trial." *United States v. Causey*, 834 F.2d 1277, 1280 (6th Cir.1987). The testimony at issue does not strike at the fundamental fairness, honesty, or public reputation of the trial because the prosecution presented sufficient evidence, in addition to the hearsay statements, for the jury to find Samour and Roberts guilty of conspiracy. The prosecution presented evidence that Samour taped $68,000 to Reynolds' body for delivery to a drug dealer in Arizona. The United States also presented the testimony of Terry Black, a Columbus police officer who monitored Reynolds' conversation with Samour, Roberts, and Kraus immediately prior to their arrests. The men discussed the trip, Reynolds' shipment, and the need to get scales before getting back together. Therefore, the district court did not commit plain error. The admission of the testimony of Kraus and Reynolds was proper.

 Roberts also contests the district court's conversion of cash into marijuana in order to estimate the quantity distributed by Roberts for the purposes of sentencing. Roberts asserts that the district court erred in determining the amount of marijuana that should be taken into account in computing his sentence. When the United States finds only a small amount of illegal drugs that does not reflect the scale of the offense, the Sentencing Guidelines direct the sentencing court to estimate the amount of drugs involved by analyzing "the price generally obtained for the controlled substance, financial or other records, [and] similar transactions in controlled substances by the defendant." Sentencing Guidelines § 2D1.4, comment (n. 2). This circuit has used this section to approve the conversion of seized funds into an equivalent amount of drugs. *See United States v. Walton*, 908 F.2d 1289, 1301–02 (6th Cir.), *cert. denied*, 498 U.S. 989, 990, 111 S.Ct. 530, 532, 112 L.Ed.2d 541, 542 (1990). The converted amount must be supported by a preponderance of the evidence. *United States v. Jackson*, 990 F.2d 251, 253 (6th Cir.1993). In reviewing this calculation, we examine both the amount of cash to be converted and the calculated value of the drugs. *Id.* at 254. Depending upon the estimates used by the sentencing court, the defendant could receive a higher or lower base offense level and a corresponding range of time to be served.

 In the present case, we find that the amount of drugs involved, as determined by converting cash into drugs, was not established by a preponderance of the evidence. The district court held Roberts accountable for 225 pounds of marijuana. This amount of marijuana is the equivalent of 102.06 kilograms, which falls within the 100–kilogram to 400–kilogram range that corresponds to a base offense level of twenty-six. Roberts received a base offense level of twenty-six based on the 225–pound estimate. The district court reached the 225–pound total by adding 100 pounds of actual marijuana seized from Reynolds' car at the time of the arrests to 125 pounds that is an estimate of additional shipments in which Roberts participated. The 125–pound estimate is derived from the sum of 100 pounds, found by converting the $30,000 found on July 2, 1991 in the car

driven by Roberts, and twenty-five pounds, found by converting the $8,000 that Roberts gave Cha Cho in early 1991. The court specifically decided that the 103–pound shipment from November of 1991 could not be attributed to Roberts. The district court's computations equate to $300 per pound for the $30,000 and $320 per pound for the $8,000. The sentencing court indicated that it based its calculations on prices that were used in prior transactions in the conspiracy. However, there was no testimony in the record regarding the $300 or $320 amounts, and the record does not indicate how the district court reached these figures.

The district court's conversion calculations are in conflict with testimony at trial regarding the price per pound for marijuana. Reynolds testified that marijuana costs $2,000 per pound. Kraus stated that $1,500 was the value of a pound of marijuana. This uncontradicted testimony leads us to find that the conversion figures used by the sentencing court are not supported by a preponderance of the evidence. There is no evidence to support the sentencing court's calculations while there is testimony in the record that contradicts the figures used by the court. Therefore, we remand Roberts' case for resentencing consistent with this opinion.

For the foregoing reasons, we reverse Samour's conviction for money laundering, but affirm all other convictions for both defendants. We remand Samour's case for resentencing on the remaining counts of conviction. We also remand Roberts' case to allow the district court to reexamine the method of conversion of cash into marijuana and for resentencing consistent with the revised calculations.

KENNEDY, Circuit Judge, dissenting.

I concur in all of the majority opinion except the dismissal of the section 1956(a)(1)(A)(i) convictions. I agree with the majority that mere transportation of cash is not a "financial transaction." However, there is more than the mere transportation of cash alleged in counts 2, 5, 6 and 7. There is also the use of those funds to purchase marijuana. That purchase seems to me to be a "transaction" as defined in subsection (c)(3)

("the term 'transaction' includes a purchase, sale, loan, pledge, gift, transfer, delivery or other disposition"), and a "financial transaction" under subsection (c)(4) ("a transaction which in any way or degree affects interstate or foreign commerce ... involving the movement of funds by wire or other means").

The transactions here affect interstate commerce. There are purchases of marijuana alleged in each count and proved as to each count with the proceeds of unlawful activity. There is the movement of funds by "other means," namely, in an automobile or airplane or on the person of the courier. The "financial transaction" was conducted with the intent to promote the marijuana conspiracy which is a specified unlawful activity. I agree with the panel of the Second Circuit in *United States v. Skinner*, 946 F.2d 176 (2d Cir.1991), upholding the conviction under this section for payment for illegal drugs with the proceeds from illegal drug sales. Although the earlier transfers of funds in *Skinner* were by United States Postal Service money orders sent from Vermont to Alaska, part of the 120 grams were sold directly by Blodgett to Skinner in Vermont after Blodgett returned to Vermont. Dealing with defendant's arguments, the Second Circuit held:

First, appellants argue that they were improperly convicted of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (1988), because the statute was designed to criminalize financial transactions aimed at concealing the source of proceeds generated from illegal activity. Congress did not intend, they argue, to convert simple payment for illegal drugs into an independent offense. Although appellants' conduct seems to differ from that which we traditionally associate with the term "money laundering," the language Congress used in 18 U.S.C. § 1956(a)(1)(A)(i) shows that it sought to reach conduct that went beyond the concealment of proceeds of criminal activity. Indeed, the words of this provision of the statute, in conjunction with the definitions provided in 18 U.S.C. § 1956(c) (1988), demonstrate that Congress intended to make unlawful a broad array of transactions designed to facilitate

numerous federal crimes, including the sale of cocaine.

Where, as here, the statutory language is unambiguous, absent legislative history that contradicts that language, we will not adopt a different construction of the statute. *United States v. Holroyd,* 732 F.2d 1122, 1125 (2d Cir.1984). Appellants have pointed to no legislative history that contradicts the plain meaning of § 1956(a)(1)(A)(i). Nor has our own review of the legislative history given us reason to deviate from the district court's view of the breadth of the statute.

*Id.* at 177–78 (footnote omitted).

Nor am I persuaded that because elsewhere in section 1956, subsection (a)(2) (transporting funds from the United States to or through a foreign country to promote an unlawful activity is specifically punished), that Congress did not intend in subsection (a)(1)(A) to include transporting funds across state lines and using them to carry out an unlawful activity. If, as subsection (a)(1)(A) appears to say, all purchases with drug proceeds affecting interstate commerce with intent to promote the unlawful activity are already crimes, then there was no need to include these in section 1956(a)(2).

Neither *United States v. Bell,* 936 F.2d 337, 341–42 (7th Cir.1991), nor *United States v. Gonzalez–Rodriguez,* 966 F.2d 918, 926 (5th Cir.1992), cited in the majority opinion, are to the contrary. In *Bell,* as the majority points out, the money was merely placed in a safe deposit box. It was not used in a transaction. In *Gonzalez–Rodriguez,* the defendant, who was convicted of money laundering, was convicted under subsection (a)(1)(B)(i). *Id.* at 924, n. 9. Further, the defendant was merely found with drug proceeds. They had not been used in any transaction.

I would AFFIRM the 18 U.S.C. § 1956(a)(1) convictions.