UNITED STATES of America, Plaintiff–Appellee,

v.

Robert Reggie OLESON, Defendant–Appellant.

No. 93–2406.

United States Court of Appeals, Sixth Circuit.

Aug. 8, 1994.

Decided Jan. 10, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 23, 1995.

382

John C. Bruha, Patricia C. Uetz, and Lloyd K. Meyer (argued and briefed), Office of the U.S. Atty., Grand Rapids, MI, for plaintiff-appellee.

Frank E. Stanley (argued and briefed), Grand Rapids, MI, for defendant-appellant.

Before: MARTIN, NELSON, and DAUGHTREY, Circuit Judges.

MARTIN, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. NELSON, J. (pp. 386–88), delivered a separate opinion concurring in the judgment.

BOYCE F. MARTIN, Jr., Circuit Judge.

A jury convicted Robert Reggie Oleson of trafficking in marijuana, conspiring to distribute marijuana, aiding and abetting the possession of marijuana, and money laundering. Arguing that his alleged conduct did not violate the money laundering statute, 18 U.S.C. § 1956, Oleson appeals his conviction on that charge. He also claims that the district court committed an evidentiary error requiring the reversal of his convictions. Finally, Oleson challenges the sentence imposed by the district court, contending that the court attributed an excessive quantity of marijuana to him for sentencing purposes and that its "obstruction of justice" enhancement was unwarranted. We reverse Oleson's conviction for money laundering and remand his case for resentencing in light of this decision.

## I.

Authorities were first alerted to Oleson's potential involvement in a marijuana distribution ring after the March 15, 1991, arrest of Genevieve Tadman and her daughter Nancy Tadman. The Tadmans were apprehended at an immigration checkpoint in Las Cruces, New Mexico, after 387 pounds of marijuana were found in the camper they were driving. Genevieve Tadman later told police that she and her daughter had been hired by Oleson to transport the marijuana to Michigan. According to Tadman, who ultimately testified at Oleson's trial, that was the nineteenth such trip she had made at Oleson's behest. Although Tadman never saw more than traces of marijuana in the transportation vehicles, she assumed that the

purpose of each trip was to transport marijuana. Moreover, Oleson apparently instructed Tadman to vacuum the transportation vehicles and to burn bacon inside them, in order to eliminate the marijuana odor.

A search warrant for Oleson's property executed in August 1991 revealed evidence of marijuana trafficking, but authorities did not arrest him until March 31, 1992, aboard a train in New Mexico. A DEA officer assigned to monitor public transportation systems had identified train passenger Oleson as a possible drug courier. After discovering a room deodorizer on the door to Oleson's sleeping compartment, the officer knocked on the door and spoke with Oleson. Although Oleson would not permit the officer to search his luggage, he consented to have it checked by a trained dog, Maggie. When Maggie alerted authorities to the presence of marijuana in one of Oleson's bags, it was seized. Oleson was arrested after 20.9 pounds of marijuana were found inside.

Pending trial, Oleson was detained in a New Mexico halfway house. During that time period, Oleson's attorney met with Michigan DEA agents concerning the Tadman-related investigation already underway in Michigan. The agents informed Oleson's attorney of the charges and corresponding penalties facing Oleson in Michigan, in conjunction with that investigation. Within twenty-four hours of that meeting, Oleson fled the halfway house.

Over a year later, authorities learned that Oleson was living in White Cloud, Michigan, in a home occupied by Susan Klaus. When they arrived to execute a search warrant, Klaus acknowledged Oleson's presence there. A search of the house, however, failed to turn up Oleson. Then Klaus directed them to a hidden room accessed by moving a portion of the bedroom wall. The officers forced the wall open, whereupon Oleson, who was hiding inside, shouted that he had a gun and warned that he would shoot if the officers did not withdraw. This confrontation lasted between thirty minutes and an hour, until the officers were able to overpower him.

Following Oleson's arrest in Michigan, a federal grand jury returned a twenty-two count indictment charging him with various drug-related offenses occurring over a roughly five-year period. The indictment charged one count of conspiracy to distribute and possession with intent to distribute marijuana, one count of aiding and abetting the possession of marijuana with the intent to distribute, nineteen counts of interstate transportation in aid of racketeering, and one count of money laundering.

At Oleson's August 1993 trial, Genevieve Tadman testified concerning the nineteen trips she made between the Southwest and Michigan to deliver marijuana for Oleson. Prior to trial, Tadman had compiled a record of the charges listed on her Visa bills and the dates of those charges, to enable her to pinpoint the trips she made for Oleson. That record, as well as eight of Tadman's credit card statements, were admitted into evidence at trial. In addition, the government used those exhibits to assist Tadman in reconstructing the events comprising her involvement with Oleson. Tadman also admitted that she once accompanied her daughter Nancy on an airplane trip from Michigan to Texas. According to Tadman, Oleson had asked Nancy to transport money for him, a sum that Tadman estimated was "around half a million" dollars. After receiving the money from Oleson, Nancy Tadman apparently hid the cash on her person, and later in her carry-on bag.

The jury found Oleson guilty of the twenty-two counts charged. The final presentence report assigned Oleson a base offense level of thirty-four, using 3,636.36 kilograms, or 8,000 pounds, as the relevant marijuana quantity. The report then recommended a four-point upward adjustment for Oleson's leadership role in the offense and a two-point increase for obstruction of justice, based upon information that Oleson had been planning an escape from jail prior to sentencing, for an offense level of forty. The final report also assigned Oleson an offense level of twenty-nine for his money laundering conviction. Based upon a prior assault and battery offense and a prior firearm offense, the report assigned Oleson to criminal history category II. The report further noted that charges were still pending against Oleson in the New

Mexico case, growing out of his arrest on the train.

At sentencing, both the United States and Oleson raised objections to the presentence report. The United States claimed that it was requesting the obstruction of justice enhancement based upon evidence that Oleson altered his appearance in the interval between his New Mexico and Michigan arrests, his departure from the New Mexico halfway house, and his standoff with police at the Klaus residence, in addition to his attempted escape from jail. Oleson, in turn, contested the quantity of drugs, 3,636.36 kilograms, used to calculate his base offense level of thirty-four, arguing that thirty-two was a more appropriate level. He also claimed that the four-level increase for his role in the offense was unwarranted, because he was only a mid-level manager in the organization. Finally, he challenged the obstruction of justice enhancement.

The district court ultimately used a total quantity of 3,166 kilograms in calculating Oleson's offense level, an estimate that the court characterized as "conservative." The court derived this figure by multiplying the 387 pounds of marijuana seized from the vehicle when Tadman was arrested by the eighteen trips she made for Oleson. Although the record indicated that Tadman actually made nineteen such trips, the court disregarded one, due to evidence indicating that the truck in which Tadman was riding did not contain marijuana. The court then added three points for Oleson's leadership role in the offense, as well as two points for obstruction of justice, based upon his escape from the New Mexico halfway house, his changed appearance, and his standoff with police at Klaus's home. These figures resulted in a total offense level of thirty-nine, and a category II criminal history score, placing Oleson in a sentencing range of 292 to 365 months. The district court sentenced Oleson to a twenty-five year term of imprisonment, followed by a four year period of supervised release.

## II.

■ Oleson first argues that his money laundering conviction was not supported by the evidence, claiming that his conduct did not violate the money laundering statute, 18 U.S.C. § 1956. The indictment charged Oleson with "investing the proceeds from drug trafficking into the purchase of additional controlled substances," specifying that he conducted "a financial transaction involving the movement of over $100,000 in U.S. currency, which was the proceeds of his unlawful drug dealing, and used this currency to conduct or facilitate his continued unlawful dealing in marijuana." Section 1956(a)(1)(A)(i) provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... with the intent to promote the carrying on of specified unlawful activity ... [is guilty of an offense under this section].

Oleson contends that the United States did not establish that he engaged in the requisite "financial transaction," as defined in Section 1956(c)(4). Relying on *United States v. Samour*, 9 F.3d 531 (6th Cir.1993), Oleson claims that neither the facts alleged in the indictment nor the evidence adduced at trial—that he gave money to Nancy Tadman to carry to Texas—constitute a violation of Section 1956(a)(1)(A)(i). We agree. In *Samour*, the defendant hired another person to travel from Ohio to Arizona to deliver drug proceeds for the purchase of additional drugs from an Arizona supplier. *Id.* at 533–34. Holding that "merely transporting cash does not meet the definition of 'financial transaction' for purposes of the money laundering statute," we reversed the defendant's money laundering convictions. *Id.* at 536. Because *Samour* is dispositive of this case, we reverse Oleson's conviction for money laundering and remand his case for resentencing.

## III.

■ Oleson also claims that the district court improperly allowed testimony concerning his New Mexico arrest. At trial, Oleson objected to its introduction, arguing that it was excludable under Fed.R.Evid. 404(b), as

evidence of another crime offered to demonstrate Oleson's criminal proclivity, and under Fed.R.Evid. 403, due to its prejudicial impact. The district court overruled his objections, determining that the New Mexico events occurred within the time frame of the conspiracy alleged in the indictment, that the conduct, on its face, did not appear to be outside of the conspiracy, and that the prejudicial nature of the testimony did not outweigh its probative value.

■ Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," though it may be admissible "for other purposes." In ruling on the admission of such evidence, the district court must also determine whether its probative value is substantially outweighed by its prejudicial impact. Fed.R.Evid. 403. This Court recently clarified the standard of review applicable to a district court's Rule 404(b) determination:

> Although this court has frequently stated that we review 404(b) evidence under an abuse of discretion standard, we believe it is more precise to state the following. First, it must be determined as a matter of preliminary fact whether there is sufficient evidence that the prior act occurred. Second, a legal determination must be made whether the "other act" allegedly committed by the defendant was admissible as evidence of "intent, preparation, [or] plan".

*United States v. Gessa,* 971 F.2d 1257, 1261 (6th Cir.1992) *(en banc)* (citations omitted). Thus, the only component of a district court's Rule 404(b) determination that we review for abuse of discretion is the portion that invokes the probative value-prejudicial impact balancing test. *United States v. Fountain,* 2 F.3d 656, 667 (6th Cir.1993) (citing *Gessa,* 971 F.2d at 1262). "We review the underlying admissibility of the other acts evidence under a *de novo* standard." *Id.* In doing so, we find that the testimony concerning Oleson's New Mexico arrest was admissible because the circumstances, or the "methods of operations" of the parties involved, were sufficiently factually linked. The conduct surrounding Oleson's New Mexico arrest falls within the indictment's description of the conspirators'

plan to "from time to time, travel in interstate commerce with the intent to distribute the proceeds of their unlawful activity and to otherwise promote ... the unlawful activity." Further, the district court did not abuse its discretion in determining that the prejudicial nature of the testimony did not outweigh its probative value.

## IV.

■ Oleson also contends that the district court erred in calculating the quantity of marijuana involved in his offense, challenging the method it employed to estimate the amount. He claims that the resulting quantity, derived by multiplying the amount Tadman was carrying upon her arrest (387 pounds) by the number of trips she made for Oleson (18), was not supported by the evidence. This Court must accept a district court's factual findings regarding the amount of drugs for which a defendant is to be held accountable unless clearly erroneous. *United States v. Baro,* 15 F.3d 563, 568–69 (6th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 285, 130 L.Ed.2d 201 (1994) (citing *United States v. Walton,* 908 F.2d 1289, 1300–01 (6th Cir.), *cert. denied,* 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990)). While guilt beyond a reasonable doubt is still the standard of proof required in the direct criminal proceeding, the level of proof needed to establish the facts relevant to a sentencing decision is the lower preponderance of the evidence standard. *United States v. Zimmer,* 14 F.3d 286, 290 (6th Cir.1994); *see also United States v. Silverman,* 976 F.2d 1502, 1508 (6th Cir.1992) *(en banc)* (ruling that although a sentence may not be imposed on the basis of material misinformation, trial-like procedural protections are not constitutionally mandated at sentencing), *cert. denied,* — U.S. —, 113 S.Ct. 1595, 123 L.Ed.2d 159 (1993). Where it is impossible for the district court to determine exact drug quantities, it may make reasonable estimates, provided those estimates are supported by a preponderance of the evidence. *Walton,* 908 F.2d at 1302.

Here, the amount of marijuana that the district court attributed to Oleson was neither "created from whole cloth," nor a "guess." *Zimmer,* 14 F.3d at 290. Tadman testified about the nineteen trips, using her

credit card statements to verify each trip. While there was no direct proof of the precise quantity of marijuana transported during each trip, there was certainly a great deal of circumstantial evidence, which the jury accepted in convicting Oleson on all of the marijuana transportation counts charged. Testimony at trial also indicated that the transportation vehicles used in this operation had compartments that could conceal between 400 and 600 pounds of marijuana. In addition, although Tadman may not have seen the drugs, there is significant evidence that she was aware that the transportation vehicles contained marijuana.

## V.

Finally, Oleson argues that the district court improperly added two points for obstruction of justice to his base offense level under Section 3C1.1 of the Sentencing Guidelines. This Court reviews a district court's factual determination that a defendant's conduct constitutes an obstruction of justice under Section 3C1.1 for abuse of discretion. *United States v. Moss,* 9 F.3d 543, 553 (6th Cir.1993) (citations omitted). The district court did not err in finding that Oleson fled the New Mexico halfway house with the intent to frustrate law enforcement efforts, that he "dramatically" altered his appearance after he escaped, and that he engaged in a standoff with police in an attempt to avoid apprehension.

After having assessed the validity of the factfinding under the abuse of discretion standard, we review *de novo* the question of whether that conduct amounts to an obstruction of justice, because that determination hinges on the legal application of a guideline term. *United States v. Sanchez,* 928 F.2d 1450, 1458 (6th Cir.1991). Application Note 3(e) of Section 3C1.1 states that "escaping or attempting to escape from custody before trial or sentencing or willfully failing to appear, as ordered, for a judicial proceeding," is obstructive conduct. Merely "avoiding or fleeing from arrest," however, is not. U.S.S.G. § 3C1.1, comment. (n.4(d)). We believe that Oleson's behavior of fleeing the halfway house, altering his appearance, and engaging in a standoff with police amounts to more than "avoiding or fleeing from arrest". Further, Oleson was under judicial control

when he fled. Because Oleson defied a judicial order, his flight constituted obstruction of justice within the meaning of the guidelines. *See United States v. Perry,* 908 F.2d 56, 59 (6th Cir.), *cert. denied,* 498 U.S. 1002, 111 S.Ct. 565, 112 L.Ed.2d 571 (1990) (applying Section 3C1.1 to a defendant who "jumped bond before sentencing and was not apprehended until the better part of a year had passed"). Although the judicial order that Oleson violated stemmed from a different prosecution, we presume that his escape was motivated by the imminent charges in the Michigan marijuana scheme. Thus, the obstruction of justice enhancement was warranted.

## VI.

For the foregoing reasons, the money laundering conviction is set aside, and all other parts of the judgment are affirmed. Because this decision could affect the sentencing range, the case is remanded to the district court for resentencing.

DAVID A. NELSON, Circuit Judge, concurring in the judgment.

Although I concur, I write separately to explain that I do so reluctantly insofar as the money laundering issue covered in Part II of the court's opinion is concerned.

Count 22 of the indictment—the money laundering count—charged Oleson with having violated 18 U.S.C. § 1956(a)(3)(A), among other statutory provisions. (Count 22 did not cite § 1956(a)(1)(A).) Section 1956(a)(3)(A) provides in pertinent part as follows:

"Whoever with the intent—

(A) to promote the carrying on of specified unlawful activity

\* \* \* \* \* \*

conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity ... shall be fined under this title or imprisoned for not more than 20 years...."

The term "transaction," as used in § 1956, includes, among other things, a "delivery." 18 U.S.C. § 1956(c)(3). The term "financial transaction" includes "a transaction ... involving one or more monetary instru-

ments...." 18 U.S.C. § 1956(c)(4). (Both of these subsections were likewise cited in count 22 of the indictment.) The term "monetary instruments" includes "coin or currency of the United States or of any other country...." 18 U.S.C. § 1956(c)(5).

The evidence in the case at bar was sufficient to support findings that defendant Oleson delivered to Nancy Tadman monetary instruments in the form of United States currency; that these monetary instruments constituted proceeds of unlawful drug dealing; and that Oleson made the delivery to Nancy Tadman with the intent that the instruments be transported to Texas for investment in marijuana, thereby promoting Oleson's unlawful drug business. Without objection from the defendant, the trial court instructed the jury that "[t]he term 'transaction' includes a transfer or delivery;" that "[t]he term 'financial transaction' means a transaction ... involving one or more monetary instruments;" and that "[t]he term 'monetary instruments' means coin or currency of the United States or of any other country...." On these instructions—which meticulously tracked the language of the pertinent statutory provisions—the jury returned a verdict of guilty. If we were writing on a clean slate, I should have no hesitancy in voting to affirm the conviction.

But we are not writing on a clean slate, of course. In *United States v. Samour*, 9 F.3d 531 (6th Cir.1993), where the facts were strikingly similar to those presented here,[1] we overturned a money laundering conviction on the ground that the mere transportation of cash does not constitute a "financial transaction." My colleagues on the panel view *Samour* as dispositive. Subject to the reservations described below, I agree.

My reservations stem from the way in which *Samour* dealt with the circumstance that alternative definitions of "financial transaction" are provided in § 1956(c)(4)(A). Under § 1956(c)(4)(A)(i), the term can mean a transaction "involving the movement of funds by wire or other means." Alternatively, under § 1956(c)(4)(A)(ii), the term can

mean a transaction "involving one or more monetary instruments." Focusing on the first of these alternatives, the *Samour* panel described the issue to be decided as "whether transporting money concealed either in an automobile or on one's person is a 'financial transaction.'" *Samour*, 9 F.3d at 535. The panel concluded, as noted above, that merely transporting cash is not such a "transaction." *Id.* at 535. Nowhere, however, did the *Samour* panel purport to hold that *delivery* of United States currency is not a "transaction."

The *Samour* panel did acknowledge that under § 1956(c)(4)(A)(ii) a financial transaction includes a transaction involving one or more monetary instruments, while § 1956(c)(3) defines "transaction" to include "transfer, delivery, or other disposition." The panel stated, however, that "[t]hese statutory definitions do not address the specific situation before us." *Id.* at 535.

I am frank to say that I do not understand why these statutory definitions were not considered pertinent in *Samour*, the trial court in that case having explicitly instructed the jury that "[t]he term 'transaction' includes a purchase, sale, loan, gift, transfer, *delivery*, or other disposition." (Trial transcript of April 7, 1992, at p. 307; emphasis supplied.) The *Samour* panel said what it said, however, and what it seemed to be saying was that the alternative definition of a "financial transaction" as a transaction ("delivery," *e.g.*) "involving one or more monetary instruments" simply was not implicated.

The *Samour* panel may have assumed that a delivery of monetary instruments cannot constitute a transaction, but "[a] point of law merely assumed in an opinion, not discussed, is not authoritative." *Matter of Stegall*, 865 F.2d 140, 142 (7th Cir.1989), citing *inter al., United States v. Kucik*, 844 F.2d 493, 498 (7th Cir.1988); *United States v. Crawley*, 837 F.2d 291, 293 (7th Cir.1988). Technically, therefore, I suppose it would be open to this panel to vacate Mr. Oleson's money laundering conviction on the principle that transportation of cash is not a "movement of funds by

---

1. The defendant in *Samour* was prosecuted not under § 1956(a)(3)(A), but under different subsections of § 1956. As in the case at bar, however, the applicability of the subsections turned on whether the defendant had conducted a "finan-

cial transaction." And in *Samour*, as here, the district court instructed the jury that the term "transaction" includes, among other things, a "delivery."

wire or other means," while permitting a retrial limited to the question whether Oleson violated the money laundering statute by making a "delivery" of "one or more monetary instruments."

I do not advocate this course. Because the instructions given by the trial court in *Samour* were substantially identical to those given by the trial court here; because the underlying facts of the two cases are indistinguishable on any meaningful ground; and because of the possibility that I may not fully have understood the scope of *Samour*, I bow to my colleagues' view that *Samour* is dispositive. *Samour* may be a somewhat flawed decision, but it is a published decision that this panel, under our longstanding tradition, is not at liberty to overrule.

