UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 91-2840

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EMMA GONZALEZ-RODRIGUEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

(          July 2, 1992          )

Before GOLDBERG, JONES, and DeMOSS, Circuit Judges.

GOLDBERG, Circuit Judge:

In this challenge to the sufficiency of the evidence, we must unravel the argot of the drug trade to determine whether the defendant joined a conspiracy to possess marijuana with intent to distribute, used communication facilities to facilitate narcotic transactions, and laundered proceeds derived from the drug trade.

**I.**

Defendant-appellant Emma Gonzalez-Rodriguez ("Emma") was

romantically involved with one Mike Rena, Sr., owner of an auto repair shop which, without dispute, served as a front for his drug business. Rena had several people working under him, among them: Joe Rena, who was arrested by police while transporting a large quantity of marijuana in a rented, white Lincoln Continental; Norma, who was in the white Lincoln with Joe; Jaime Gonzalez, who, at some unspecified time, picked up a two-pound bag from Emma, which reeked of marijuana, and delivered it to Rena; and Lydia, another underling who was summoned to assist on several occasions.

The bulk of the evidence tying Emma to Rena's drug trade consisted of audio-recorded phone conversations between Emma and Rena, intercepted by the government pursuant to a court-authorized wiretap. For the most part, the conversants did not speak in explicit terms when discussing drug transaction, though on more than one occasion they used the term "pot," a common slang term for marijuana.[1] This evidence, construed in the light most favorable to the government,[2] established that Emma discussed several meetings and transactions relating to Rena's drug activity, assisted Rena in making arrangements for the transportation of certain drug quantities (including Joe Rena's thwarted effort in

---

[1] In the district court, Emma vigorously contested whether the word used was "pot" or "pop."

[2] We must view the evidence in the light most favorable to the government because the jury rendered a verdict of guilty. United States v. Menesses, ___ F.2d ___, ___, slip op. 4888, 4894 (5th Cir. May 22, 1992); United States v. Sanchez, ___ F.2d ___, ___, slip op. 4768, 4772-73 (5th Cir. May 19, 1992).

the white Lincoln), and agreed to join Rena in picking up cash derived from Rena's drug deals. To be sure, law enforcement agents observed Rena and Emma board a commercial airplane at the Houston airport. When they returned two days later, the agents approached them and asked them whether they were carrying any cash. Emma and Rena responded that they were, and each of them tendered approximately $8,000 for the officers to count. The officers returned the money to them and allowed them to continue on their way without further interruption. In a conversation with another conspirator about the incident at the Houston airport, Rena expressed his relief that he had not picked up all of the cash, confirming the illicit nature of the proceeds.

A jury convicted Emma on eight counts: one count of conspiracy to possess marijuana with intent to distribute, 21 U.S.C. § 846, six telephone counts, 21 U.S.C. § 843(b), and one count of money laundering, 18 U.S.C. § 1956. The district court sentenced her to 63 months on each of the eight counts, all to run concurrently.

Emma contends that the evidence was insufficient to support the convictions. She maintains that the government merely proved: (1) that Emma was the girlfriend of Mike Rena, Sr., a drug dealer; (2) that she and Rena were stopped in the Houston airport carrying approximately $8,000 each; and (3) that at some unspecified time, Jaime Gonzalez picked up a two pound bag from her, which smelled of marijuana, and delivered it to Rena. According to Emma, those

facts cannot support the convictions on any of the eight counts. She vigorously contests the significance of the wiretap evidence, arguing that none of it established, beyond a reasonable doubt, that she joined Rena's conspiracy, used a communication facility to facilitate drug transactions, and knowingly laundered drug proceeds. Although she concedes that her voice was properly identified on six of the tapes, she disputes the identification of her voice on the other tapes. She also contests the government's suggestion that she was speaking in drug code.

## II.

Our standard for reviewing the sufficiency of the evidence to support a conviction is "whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." United States v. Menesses, ___ F.2d ___, ___, slip op. 4888, 4894 (5th Cir. May 22, 1992); United States v. Sanchez, ___ F.2d ___, ___, slip op. 4768, 4772-73 (5th Cir. May 19, 1992). We view the evidence in the light most favorable to the verdict, note 2, supra, and reverse the conviction only if the evidence, viewed in that light, "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged." Menesses, slip op. at 4894 (quoting form other cases); Sanchez, slip op. at 4773 (same). We need not rule out all hypotheses of innocence, however, for the jury is entitled "to choose among reasonable constructions of the evidence." Menesses, slip op. at 4894 (quoting United States v.

Bell, 678 F.2d 547, 549 (5th Cir. 1982), aff'd, 462 U.S. 356 (1983)).  With this standard of review in mind, we turn to the eight counts on which Emma stands convicted.

## A.  *The Conspiracy -- 21 U.S.C. § 846*

The law of drug conspiracy in this circuit is well-settled, and aptly summarized in Judge Reynaldo G. Garza's recent opinion in Sanchez:

> To establish guilt of a drug conspiracy, it must be proven that an agreement with intent to distribute existed, that the defendant had knowledge of the agreement, and that the defendant voluntarily participated in the conspiracy.  An agreement may be inferred from concert of action, participation form a "collocation of circumstances," and knowledge from surrounding circumstances.  Mere presence at the scene and close association with those involved are insufficient factors alone; nevertheless, they are *relevant* factors for the jury.

Slip op. at 4773 (emphasis in original) (citations omitted).

Emma does not dispute that Rena was involved in the drug trade, and that he conspired with others (Joe Rena, Jaime Gonzalez, Norma, Lydia, and Tio) to possess marijuana for the purpose of distributing it.  Nor does Emma seriously contend that she was unaware of Rena's drug activities.  She was intimately familiar, for example, with Joe Rena's failed attempt to transport a sizable quantity of marijuana in the white Lincoln.  Furthermore, Rena did not hesitate to discuss his drug dealings with Emma.  The existence of the conspiratorial agreement and Emma's knowledge of it are readily discernible from the record.

Evidence of Emma's participation in the conspiracy, though not overwhelming, nevertheless suffices to sustain the jury verdict, as well.  In several of the conversations with Rena, Emma agreed to call other coconspirators to make arrangements for upcoming transactions.  She also undertook to make travel arrangements with regard to the cash pick-up.  See Sanchez, slip op. at 4778 (evidence sufficient to sustain conspiracy conviction where "government introduced two intercepted conversations of [the defendant] making plane reservations for her husband, Juan, the principal conspirator, and [another] named co-conspirator").  With respect to the Joe Rena's arrest while driving the white Lincoln, she told Rena that she had tried to persuade Joe to rent a less ostentatious vehicle so not to draw attention to himself while cruising on the highway.  Her possession of one half of the $16,000 cash which she and Rena picked up also establishes her participation.[3]  Contrary to Emma's intimation, the taped conversations were "more than two individuals lamenting or discussing the occurrences of the day before," for "[w]ere this the only evidence the jury could consider regarding [Emma'] status as a co-conspirator, we would be loathe to affirm her conviction."

---

[3]  Emma is correct that there is no direct evidence of her knowledge that the money was derived from drug activity.  Emma observes that Rena's statement to another coconspirator that he was relieved that he did not pick up all the cash establishes Rena's knowledge, not hers.  Nevertheless, in light of the other evidence establishing her knowledge of the drug activity, a reasonable jury could have concluded, based on circumstantial evidence, that Emma was not merely present and innocently holding onto drug proceeds, but that her participation in the trip was a "voluntary act[] in furtherance of the conspiracy."  Sanchez, slip op. at 4779.

See Sanchez, slip op. at 4778 (internal quotations omitted). But the evidence established more; it proved that Emma knowingly participated in Rena's drug conspiracy.

## B.  The Telephone Counts -- 21 U.S.C. § 843(b)

> In order to prove a violation of 21 U.S.C. § 843(b), the Government must establish that the defendant knowingly an intentionally used a communications facility, *e.g.*, a telephone, to facilitate the commission of a narcotics offense.  In order to establish the facilitation element, the Government must show that the telephone call comes within the common meaning of facilitate -- `to make easier' or less difficult, or to assist or aid.  It is sufficient if a defendant's use of a telephone to facilitate the possession or distribution of controlled substances facilitates either his own or another person's possession or distribution.

United States v. Phillips, 664 F.2d 971, 1032 (5th Cir. Unit B 1981), cert. denied, 457 U.S. 1136 (1982).  Use of a telephone to direct coconspirators to take actions in furtherance of the conspiracy violates § 843(b).  See United States v. Townsend, 924 F.2d 1385, 1414 (husband directing wife to "separate everything" before he returned in order to prepare for drug sales).  Even "giving assurances to [a coconspirator] about the security of a large quantity of concealed [narcotics] that was at that time being protected by underlings in the enterprise, facilitate[s] the unlawful possession or attempted possession of [narcotics]." Phillips, 664 F.2d at 1032.  However, using a phone to ascertain the status or progress of a drug transaction, without more, will not suffice.  See United States v. Rivera, 775 F.2d 1559, 1562 (11th Cir. 1985) (calls that "were simply to find out whether any sales had been made, and if so where was the money he was supposed

to get" did not suffice under § 843(b) because they did not facilitate the possession of narcotics), cert. denied, 106 S.Ct. 1275 (1986); see also United States v. Jones, 839 F.2d 1041, 1047 (5th Cir.) (distinguishing Rivera), cert. denied, 108 S.Ct. 1999 (1988).

The thrust of Emma's challenge to these six counts is that the government failed to identify her voice on several of the audio tapes and that, even assuming that she was the conversant, the government failed to prove that she facilitated a narcotics transaction. She does not contend that the government failed to establish the predicate for the admission of the tapes, that the tapes were so unintelligible that the district court abused its discretion by admitting them into evidence, or that the district court erred by permitting the jury to use transcripts as an aid. See United States v. Stone, 960 F.2d 426 (5th Cir. 1992). Rather, she maintains that the government's evidence establishing her identity as a speaker on some of the tapes was less than persuasive,[4] and that the government's evidence that she was speaking in code was too imaginative for any jury to accept.

---

[4] We note that the district court allowed the jury to use transcripts prepared by the government merely as an aid. Because the transcripts identified Emma as the speaker in several disputed conversations, and because there was some dispute concerning the accuracy of the transcripts, the court wisely instructed the jury on numerous occasions that the transcripts were not evidence but only there to guide the jury as they listened to the tapes. See generally Stone, 960 F.2d at 437 n.8.

As to Emma's identification argument, the government directs our attention to the testimony of the intercepting agents who identified Emma's voice at trial. They testified that after listening to the voices over a period of time, they came to recognize the voices of the conspirators, including Emma. (3 R. 46-48, 76-77) With respect to each tape, the government asked the intercepting agent whether he could identify the voices, and the agent responded that he could.[5] Whether the female voice on any particular tape belonged to Emma was therefore a question for the jury to decide. Cf. Stone, 960 F.2d at 438 ("[I]t was the province of the jury to decide whether the government's transcript was accurate, and the obligation of the defendant to raise specific challenges to the transcript before the jury.").

As to the substance of the conversations, we are satisfied that a reasonable jury -- even one lacking in cryptological expertise -- could have concluded that Emma was discussing matters pertaining to the drug conspiracy. True, much of what Emma said was monosyllabic and lacked syntactical precision.[6] But much of it also evidenced her efforts to facilitate the aims of the conspiracy. And one law enforcement agent testified that Emma and

---

[5] It bears repeating that Emma does not contend that the government failed to follow the ritualistic methodology for laying the foundation for the admission of the tapes. See Stone, 960 F.2d at 436 (citing United States v. Biggins, 551 F.2d 64, 66 (5th Cir. 1977)).

[6] More often than not, Rena would do the talking and Emma would respond "Oh," "Yeah," or "Uh-huh."

Rena, like many entrepreneurs of the drug trade, spoke in a dialect designed to conceal the substance of their discussions. Particularly because the evidence established that Rena was in fact involved in the drug trade, the jury was free to accept (or reject) the testimony of the law enforcement agent and conclude that Emma and Rena's conversations were veiled in code -- that when Emma and Rena were discussing "parts," "working on cars," and "fixing cars," they were actually referring to narcotics activity. See United States v. Guerra-Marez, 928 F.2d 665, 675 (5th Cir.) ("jury could have reasonably concluded that certain phrases used by [the co-conspirators] were code words for controlled substances"), cert. denied, 112 S.Ct. 322 (1991).

Turning to the individual counts, we conclude that the evidence is sufficient to support five of the six telephone counts. On February 19, 1990 (count 18), Emma and Rena discussed having Emma contact Lydia about transporting some "pot." Emma also spoke with Joe that evening about organizing "the troops." Both matters aimed to facilitate the conspiracy.

On March 3, 1990 (count 21), Emma and Rena discussed Joe Rena's delay in transporting the marijuana in the white Lincoln. Although we have observed that a discussion about the status of drug activity, without more, does not facilitate a conspiracy, see Rivera, 775 F.2d at 1562, here, there was more. Emma and Rena decided that Rena would have to reprimand Joe for renting a Lincoln

rather than some other, less extravagant vehicle. Emma told Rena to "get after [Joe] you're the only one that can, he don't listen to me." They were plainly discussing the need to correct the bad working habits of one of their coconspirators.

On March 6, 1990 (count 23), Emma told Rena that she spoke with someone whose name she could not disclose over the telephone, and he instructed her to wire some money to him. Rena said that would be okay and suggested that she contact Lydia, another coconspirator, to assist. On March 7, 1990 (count 26), Rena and Emma used a telephone to discuss and make flight arrangements to pick up the $16,000 cash. They discussed the arrival of "parts" a code word for the contraband. On March 16, 1990 (count 30), Emma and Rena discussed the money she was holding and Emma wanted to know what she should do with it. These conversation demonstrate that Emma and Rena were making arrangements relative to drug transactions, thus facilitating the conspiracy.

With respect to the conversations on March 15, 1990 (count 27), however, we find no evidence satisfying the facilitation requirement of § 843(b). See Phillips, 664 F.2d at 1032 (use of telephone must facilitate the underlying offense). Rena merely informed Emma that "Tio" had been caught and that "they" had seized "forty-five." This conveyance of information did not work to facilitate the conspiracy; it was nothing more than a status report, insufficient in and of itself to sustain the telephone

count.  See Rivera, 779 F.2d at 1563.

## C.  Money Laundering -- 18 U.S.C. § 1956(a)(1)(B)(i)

Emma was convicted of money laundering in connection with her possession of the $8,000 cash in the Houston airport.  The provision of the money laundering statute under which she was charged and convicted, 18 U.S.C. § 1956(a)(1)(B)(i),[7] "required that the government prove that [Emma] knowingly conducted a financial transaction which involved the proceeds of marijuana distribution and that [she] did so with the knowledge that the transaction was designed to disguise the nature, source or ownership of those proceeds."  United States v. Martin, 933 F.2d 609, 610 (8th Cir. 1991).

Emma contends first that she did not know that the cash she was carrying were the "proceeds of marijuana distribution."  We

---

[7]  The statute provides:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts such a financial transaction which in fact involves the proceeds of specified unlawful activity--

knowing that the transaction is designed in whole or in part--

to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; ...

shall be sentenced to a fine ... or imprisonment....

18 U.S.C. § 1956(a)(1)(B)(i).

reject this contention for much the same reason we rejected her challenge to the sufficiency of the evidence as to the conspiracy and telephone counts. We are satisfied that a jury could reasonably have concluded that Emma was aware of the illicit origin of the funds she was carrying. See supra note 3. We nevertheless reverse the money laundering conviction for lack of evidence establishing that Emma was engaged in a "financial transaction ... designed to disguise the nature, source or ownership of those proceeds." Martin, 933 F.2d at 610.

The money laundering statute defines a transaction to include "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition"[8] of proceeds derived from specified illegal activity, including drug transactions. 18 U.S.C. § 1956(b)(3). The government cites our circuit's decision in United States v. Gallo, 927 F.2d 815, 822 (5th Cir. 1991), to support its theory that evidence of Emma's possession of $8,000 cash in the Houston airport was sufficient to prove a money laundering transaction. In Gallo, the defendant (Gallo) was arrested while transporting a box

---

[8]   The subsection continues:

> ... and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, or any other payment, transfer, or delivery by, through or to a financial institution, by whatever means effected.

18 U.S.C. § 1956(b)(3).

containing approximately $300,000 cash in his car on an interstate highway. He had just accepted delivery of the box from Cruz, a suspected drug trafficker, and fingerprints on the box matched those of Balcazar, another known drug dealer. Gallo made two false exculpatory statements to law enforcement officers about the car and the box of cash. Moreover, Cruz and Balcazar had made a similar exchange on the same day, Cruz tendering $300,000 cash to Balcazar in exchange for twenty-five kilograms of cocaine.

On appeal from Gallo's money laundering conviction,[9] we addressed two issues: whether the evidence established his knowledge that the funds in his possession were proceeds of unlawful activity, and whether the transfer of currency in his car "had any discernible impact on interstate commerce." We held that

> [b]ased on the concert of action among [the coconspirators], and Gallo's false statements, we conclude that the jury could reasonably infer that Gallo knew that he was transporting the proceeds of unlawful activity.

Id. We held further:

> reserving judgment on a case in which the connection between the money and the drugs or illegal activity is not so clear as it is here, we conclude that Gallo's transportation of the proceeds of drug trafficking affected interstate commerce....

Id. at 823. Significantly, we did not squarely address what evidence would be necessary to satisfy the "transaction"

---

[9] The Gallo opinion does not indicate whether Gallo was convicted under subsection (A)(i) or (B)(i). In the case at bar, Emma was convicted under subsection (B)(i).

requirement of the statute.[10]

In United States v. Hamilton, 931 F.2d 1046, 1051-52 (5th Cir. 1991), we defined the term "transaction" to include the mailing of drug proceeds.[11]  In that case, the defendant mailed approximately $18,000 cash from Mississippi to California.  The cash was proceeds from drug activity.  A jury convicted the defendant under subsection (A)(i) of 18 U.S.C. § 1956(a)(1), which prohibits a financial transaction intended to "promote the carrying on of a specified unlawful activity."  18 U.S.C. § 1956(a)(1)(A)(i).  On appeal we held that "the terms of the [money laundering] statute prohibit mailing the proceeds of drug sales, and absent clearly expressed legislative intent to the contrary, that language must be regarded as conclusive unless exceptional circumstances dictate otherwise."  Hamilton, 931 F.2d at 1051.  Because the defendant was charged and convicted under subsection (A)(i), not subsection (B)(i) (under which Emma stands convicted), we did not explore the requirement, unique to subsection (B)(i), that the transaction be "designed ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  18 U.S.C. § 1956(a)(1)(B)(i).

---

[10]  Apparently, that issue was not raised on appeal.

[11]  We note that the Seventh Circuit has held that "the placing of money and/or withdrawing of money from a safe deposit box where no record is made and no interest is paid on the amount of money" did not amount to a financial transaction under 18 U.S.C. § 1956(c)(3).  United States v. Bell, 936 F.2d 337, 341 (7th Cir. 1991).

The Tenth Circuit did in United States v. Sanders, 929 F.2d 1466, 1471 (10th Cir.), cert. denied, 112 S.Ct. 143 (1991), reversing a money laundering conviction because the government failed to prove the concealment element. In that case, the defendants (husband and wife) used drug proceeds to purchase automobiles, one of which was titled in their daughter's name. They readily identified themselves to the salesperson and conspicuously used the automobiles, "making the association of these vehicles with the [defendants] obvious to law enforcement." Id. at 1472. In reversing the convictions, the court

> reject[ed] the government's argument that the money laundering statute should be interpreted broadly to encompass all transactions, however ordinary on their face, which involve the proceeds of unlawful activity. To so interpret the statute would, in the court's view, turn the money laundering statute into a "money spending statute." This interpretation would be contrary to Congress' expressly stated intent that the transactions being criminalized in the statute are those transactions "designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). Thus, by the express terms of the statute, a design to conceal or disguise the source or nature of the proceeds is a necessary element for a money laundering conviction. In other words, the purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and the proceeds used to make the purchase were obtained from illegal activities.

Id.; see also United States v. Edgmon, 952 F.2d 1206, 1211 (10th Cir. 1991) ("These involved transactions, unlike the simple automobile purchases in Sanders, certainly support a finding under the money laundering statute of intent to conceal the origin and nature of the proceeds of unlawful activity"), cert. denied, 1992

WL 127032 (1992).

The Seventh Circuit, endorsing the <u>Sanders</u> court reasoning, explained that:

> [t]he conversion of cash into goods and services as a way of concealing or disguising the wellspring of the cash is a central concern of the money laundering statute. ... To convict under 18 U.S.C. § 1956(a)(1)(B)(i) the government must prove not just that the defendant spent the ill-gotten gains, but that the expenditures were designed to hide the provenance of the funds involved.

<u>United States v. Jackson</u>, 935 F.2d 832, 841 (7th Cir. 1991), <u>cited with approval in</u> <u>United States v. Webster</u>, 960 F.2d 1301, 1308 (5th Cir. 1992); <u>see also</u> <u>United States v. Beddow</u>, 957 F.2d 1330, 1334 (6th Cir. 1992) ("the government had the burden of proving beyond a reasonable doubt that Beddow knowingly conducted a financial transaction with the proceeds of drug distribution and that he did so with the intent to conceal the nature or the source of the proceeds....").

Like <u>Sanders</u>, we find no evidence in the record establishing that Emma's possession (or transportation) of the $8,000 in drug proceeds was "designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). In the first place, the government did not introduce any evidence of Emma's flight itinerary. All the jury knew was that Emma was flying to some unknown destination to pick up something related to narcotics activity, and that she was in possession of $8,000 cash

when she disembarked form the airplane in the Houston airport. Moreover, Emma (and Rena) voluntarily cooperated with the law enforcement officers when asked about the cash. She readily disclosed that she was in possession of $8,000 and, indeed, turned it over to the agents so that they could count it, hardly an effort to conceal or disguise. Finally, there is no evidence that she made "false exculpatory statements" to the agents. Contrast Gallo, 927 F.2d at 822 (defendant made two false exculpatory statements to law enforcement officers). In the absence of evidence that Emma endeavored to conceal or disguise, her conviction under 18 U.S.C. § 1956(a)(1)(B)(i) must be reversed.

## III.

Having deciphered the patois of the narcotics trade, we REVERSE the convictions on count 27 [telephone count] and count 102 [money laundering]. The convictions as to all other counts are AFFIRMED.