United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 27, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 03-50841

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALBERTO SEGURA;
WILLIAM ENNIS; AND
CHESTER ENNIS.

Defendants-Appellants.

Appeals from the United States District Court
for the Western District of Texas

(02-CR-1430)

Before JONES, SMITH, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:[*]

Alberto Segura, William "Billy" Ennis ("William"), and his father, Chester Ennis ("Chester")

were each charged in a nine count indictment related to their involvement in a narcotics trafficking

conspiracy. Following an eight day trial, they were each found guilty as to the respective counts

against them and were consequently sentenced to varying terms of incarceration. On appeal, they

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

aver several claims of error. We have considered the arguments presented in their briefing and during oral argument. Because the record does not suggest that their convictions are infected by reversible error, we hold, for the reasons set forth below, that the convictions must be affirmed.

## I. INTRODUCTION

On September 18, 2002, Chester Ennis, William "Billy" Ennis, and Alberto Segura were indicted in a nine count superseding indictment. The indictment contained the following counts:

i.) Count One charged that between December 11, 2001 and August 29, 2002 Chester, William and Segura conspired to possess with intent to distribute both marijuana and cocaine in violation of 21 U.S.C. §§ 841 *et seq.* and 846.

ii.) Count Two charged that on April 17, 2002, Chester, William, and Segura possessed with intent to distribute cocaine in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2.

iii.) Count Three charged that on March 30, 2002, Chester knowingly and intentionally possessed with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2.

iv.) Count Four charged that on January 10, 2002, Chester knowingly and intentionally possessed with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii).

v.) Count Five charged that on April 11, 2002, William knowingly used a communication facility, specifically his cellular phone in an effort to conspire to possess with intent to distribute cocaine in violation of 21 U.S.C. § 843 and 18 U.S.C. § 2.

vi.) Count Six charged that on April 11, 2002, Chester and Segura used a communication facility, a telephone to facilitate their conspiracy to distribute cocaine in violation of 21 U.S.C. § 843

and 18 U.S.C. § 2.

vii.) Count Seven provides that on April 16, 2002 Segura knowingly and intentionally used a communication facility, a cellular phone, to conspire to possess with intent to distribute cocaine in violation of 21 U.S.C. § 843 and 18 U.S.C. § 2.

viii.) Count Eight charged that on July 23, 2002 Chester used a communication facility to, a cellular telephone, to conspire to possess with intent to distribute marijuana in violation of 21 U.S.C. § 843 and 18 U.S.C. § 2.

ix.) Count Nine charged that on August 29, 2002 Chester (along with his wife Sheila Ennis who is not involved in this appeal), knowingly and intentionally possessed with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2.

Following the trial, the jury found Chester, William, and Segura guilty as to each count charged against them in the indictment.

Segura was found guilty on Counts One, Two, Six, and Seven. Segura was sentenced to 240 months on Count One; 240 months on Count Two; 96 months on Count Six; and 96 months on Count Seven. The sentences in Counts Two, Six and Seven were to run concurrently with the 240 month sentence imposed as to Count One.

Chester was found guilty on Counts One, Two, Three, Four, Six, and Nine. The district court sentenced Chester to a term of life as to Count One; life as to Count Two; life as to Count Three; life as to Count Four; 96 months as to Count Six; and life as to Count Nine. The sentences in Counts Two, Three, Four, Six and Nine were to run concurrently with the life sentence imposed on Count One.

William was found guilty on Counts One, Two and Five. The district court sentenced William

to a term of life imprisonment as to Count One; life as to Count Two; and 96 months as to Count Five with the sentences in Count Two and Five to run concurrently with the sentence imposed in Count One.

**II.      ISSUES**

The appellants each filed a timely appeal asserting various claims of error. Because many of the individual claims of error overlap they will, where appropriate, be considered in conjunction with one another. These errors are enumerated as follows:

1.      Whether the Government presented sufficient evidence to establish that the individual on its wiretaps was in fact Segura, and similarly, whether there was sufficient evidence to convict Segura for knowingly and intentionally using a telephone to facilitate a conspiracy to possess with intent to distribute cocaine

2.      Whether there was sufficient evidence to convict Chester, William, and Segura for conspiracy?

3.      Whether there was sufficient evidence to convict William and Segura of aiding and abetting Chester in a conspiracy to possess cocaine?

4.      Whether there was prejudicial variance between the Government's indictment and the evidence that was presented at trial which Segura, William and Chester suggest indicated that there were multiple conspiracies?

5.      Whether the district court erred by denying William's motion for a new trial subsequent to court personnel inadvertently destroyed a piece of evidence – a Gateway computer box – which the Government had argued that William used while conspiring to transport narcotics?

**III.      DISCUSSION**

4

The circumstances that precipitated this matter involve a confidential informant named Arthur Portillo, who was an acquaintance of Chester Ennis. Portillo informed DEA Agent Karen Ceren that Chester Ennis was selling large quantities of drugs. On December 11, 2001, Ceren began her investigation in earnest. Portillo was instructed to gain Chester Ennis' confidence, and thereafter, Portillo was to coordinate arrangements with Chester for transporting significant quantity of narcotics.

The first transaction between Portillo and Chester Ennis occurred on January 10, 2002, wherein Ceren provided Portillo with $15,000 and affixed a recording device to Portillo's person. Portillo subsequently met with Chester Ennis that same evening and exchanged the money for one kilogram of cocaine.

A second transaction, involved Chester Ennis, and several other individuals not implicated in this appeal. On March 30, 2002 approximately 700 pounds of marijuana was delivered to Chester's residence in El Paso, Texas. It was believed that the marijuana was eventually destined to be sold in Minneapolis, Minnesota or Columbus, Ohio.

The third transaction, around which the majority of Chester, William, and Segura's claims derive, involved a scheme to distribute more than 30 kilograms of cocaine from the home of Chester , wherein Portillo, who also worked as the driver of a tractor-trailer, was to transport the cocaine from the residence to Manhattan, New York.

**A.** **Whether the evidence presented by the Government supported the jury's finding that an individual heard on the government's tapes was in fact Segura?**

Alberto Segura argues that his conviction was erroneous because the prosecution did not sufficiently prove that the voice of the individual that was heard on the tape recorded conversations

was indeed the same "Alberto Segura" who was named as a defendant in this matter. Specifically, Segura asserts that the recorded conversations from April 10, 2002 through April 17, 2002 have never been conclusively determined to be his voice. Segura concedes that the Government provided an explanation as to how it determined that the voice heard on the tapes was his, and, that one's identity may be proven through circumstantial evidence. However, he maintains that there was no demonstration that the voice was in fact his own. Consequently, Segura argues that the jury improperly concluded that the voice that was heard on the tapes was his. In addition, Segura contends that even assuming arguendo that the voice that is heard on the tapes is his own, nothing heard on those tapes actually suggests that he was complicit in the crimes enumerated in the indictment.

The predicate to introducing evidence of a recorded conversation during the course of a criminal trial first requires the Government to establish that the voices recorded accurately reproduce statements of the individual in question; this means that it is incumbent upon the government to establish that: (1) the recording device was operated by a competent individual; (2) the recording equipment was in sufficient working condition; (3) the recording was bereft of any significant alterations that would have compromised the principal contents of the recordings; and (4) the speakers heard on the recordings could be identified. See United States v. Stone, 960 F.2d 426, 436 (5th Cir. 1992) (citing United States v. Biggins, 551 F.2d 64, 66 (5th Cir. 1977)). The aforementioned is not designed to be a talismanic recitation of factors that must be adhered to prior to the introduction of tape recordings into evidence. Id. Instead while obviously the preferable course is for the district court to comply with the factors outlined, we have never suggested that these factors constitute a rigid or formulaic criteria. Id. Moreover, the propriety of the admission of such

6

evidence remains vested within the discretion of the district court. Id.

To be held criminally liable under 21 U.S.C. § 843(b), the onus is on the Government to establish that the accused has both knowingly and intentionally made use of a device, i.e., such as a telephone, to facilitate the commission of a narcotics violation. See, e.g., United States v. Gonzalez-Rodriguez, 966 F.2d 918, 921 (5th Cir. 1992) (citing United States v. Phillips, 664 F.2d 971, 1032 (5th Cir. Unit B 1981)); United States v. Martinez, 950 F.2d 222, 224 (5th Cir. 1991); accord United States v. Dotson, 871 F.2d 1318, 1321 (10th Cir. 1989) ("In order to sustain a conviction under section 843(b), the government must thus prove three formal elements: (1) a knowing or intentional; (2) use of a communication facility; (3) to facilitate the commission of a drug offense."). The use of the term "facilitate" is intended to have the same import as the term is understood in general parlance, where in the course of facilitating the narcotics offense, usage of the telephone made it easier for the crime to occur. Gonzalez-Rodriguez, 966 F.2d at 921. One's liability pursuant to § 843(b) does not simply turn on whether the telephone was used in facilitating the possession or distribution of one's *own* narcotics transactions, the term facilitation would also encompass facilitating the possession and distribution of narcotics held by another. Id. Moreover, as Segura's underlying crime is inchoate – conspiracy to possess with intent to distribute cocaine– the government is not required to show that the crime was completed. See United States v. Rey, 641 F.2d 222, 224 n. 6 (5th Cir. Unit A Mar. 1981).

There is simply no doubt that if the taped conversations were in fact Segura's voice, the propriety of his conviction pursuant to §843(b) would be unquestioned. However, Segura generally asserts that the Government did not make the requisite showing that his was the voice that was heard on the tape recorded conversations presented to the jury. This argument is specious considering: (1)

7

the testimony of law enforcement officers who identified the voice heard on the tapes as belonging to Segura, (2) voice exemplars that were played for jurors wherein he identifies himself as "Alberto Segura" and that he was the owner of "Roof Masters," (3) surveillance demonstrating that Segura drove a truck emblazoned with the "Roof Masters" logo, and (4) several telephone conversations between Segura (using a phone subscribed to his wife) and Chester Ennis related to drug trafficking. During one taped conversation in particular, when Chester Ennis asks to speak to "Beto" --one of Segura's nicknames – Segura immediately picks up the telephone receiver and begins speaking with Chester. This backdrop essentially underscores why Segura's assertions are without merit.

Moreover, we believe that Gonzalez-Rodriguez, is instructive as to the question presented. In that case, the defendant, who had been implicated in a narcotics trafficking conspiracy averred that the Government could not prove that her voice was the same one heard on the certain audio tapes sought to be admitted at her criminal trial. Additionally, even if the voice had proven to be hers, she argued that the Government had not shown that statements she allegedly made went towards establishing that she had facilitated a narcotics transaction. We iterated that the question of whether the voice heard on the tape actually belonged to the defendant was one that was expressly reserved for the jury to resolve as the fact-finder. Gonzalez-Rodriguez, 966 F.2d at 922; see also United States v. Cuesta, 597 F.2d 903, 915 (5th Cir. 1979). Several observations were made in support of our conclusion. First, we observed that the jurors heard several conversations in which the defendant and her co-defendants were engaged in discussing drug trafficking via the use of code language. Gonzalez-Ramirez, 966 F.2d at 922. Second, we also noted that the jurors heard testimony from a law enforcement officer who testified that the one of the voices heard on the tapes belonged to the defendant. Id. The officer also "deciphered" the conversations for the jurors' benefit, explaining drug

8

trafficking nomenclature. Id at 922-23. We then acknowledged that based on the foregoing, the jury was within its rights to either accept or reject the officer's testimony involving the defendant and to ultimately conclude that it was she who was discussing narcotics trafficking. Id. at 923.

Similarly, in this case, the jury heard Segura make a number of statements while speaking on the telephone, which, as will be discussed in greater detail below, incontrovertibly refer to "narcotics activities." Id. at 922. Most importantly, it was the jury who was vested with the authority to weigh whether Segura's conversations ultimately suggested that he was attempting to facilitate a drug transaction. Consequently, we defer to the jury if the evidence presented would support the conclusion reached.

As it pertains to the issue of whether the voice heard on the tapes was Segura's, it should be noted that this question may permissibly be determined through indirect evidence. In United States v. Royals, 777 F.2d 1089 (5th Cir.1985), the defendant, who had been convicted for his involvement in a marijuana trafficking conspiracy, argued, just as Segura does, that the prosecution never presented any witness who identified him in court, and similarly maintained that the evidence was insufficient to prove that he was a member of the conspiracy. Id. at 1091. We held to the contrary and noted that one's "identity may be proved by inference and circumstantial evidence." Id.

Thus to summarize, in our case the jury heard voice exemplars of Segura as well as numerous tape recorded telephone conversations made between himself and the other appellants. Morever, law enforcement officers testified at trial that the voice heard on the tapes was Segura's. As such, we believe that the jury could appropriately infer that the identity of the individual heard on the tape recorded conversations, and the individual named Alberto Segura sitting at the defendants' table during the trial were one and the same. Accordingly, we reject his argument that there was

9

insufficient evidence to support the relevant counts of conviction.

**B.      Whether there was sufficient evidence to convict Chester, William, and Segura with conspiring to possess with intent to distribute narcotics?**

In determining whether sufficient evidence was presented to support a finding of guilt related to the counts of the indictment, we accord a tremendous degree of deference in analyzing whether the jury erred.  See United States v. Redd, 355 F.3d 866, 872 (5th Cir. 2003).  Consequently, our standard of review does not require this court to  assess the saliency of the jury's  determination, but instead we are only required to evaluate whether the decision was reasonable given the evidence presented.  Id.   In our considerat ion, the sufficiency of the evidence is evaluated in a light most supportive of the verdict rendered by the jury.  United States v. Hayes, 342 F.3d 385, 389 (5th Cir. 2003).  This includes the presumption that all reasonable inferences and credibility determinations rendered were ultimately correct; and similarly, calls upon this court to determine whether the evidence presented to the jury could properly allow it to conclude that every element of the particular crime has been proven beyond all reasonable doubt.  See, e.g., Jackson v. Virginia, 443 U.S. 307, 319 (1979); Redd, 355 F.3d at 872; United States v. Sanchez-Milam, 305 F.3d 310, 312 (5th Cir. 2002).

The elements to support a conviction for drug conspiracy are well understood.  The Government must establish: (1) that there existed an agreement between the co-defendants to violate an existing drug law; (2) the co-defendants were aware of the agreement; and (3) the co-defendants voluntarily participated in the agreement.  See, e.g., United States v. Turner, 319 F.3d 716, 721 (5th Cir. 2003);  United States v. Cortinas, 142 F.3d 242, 249 (5th Cir. 1998).  As such, we must uphold a conviction on a conspiracy count if a rational jury could conclude that the evidence presented

10

satisfies the foregoing elements. This does not mean that these elements must be directly proven, as a defendant may be found to be both cognizant of the conspiracy and to have participated in its furtherance simply based on a collocation of circumstances. See Hayes, 342 F.3d at 390 (citation omitted). That understood however, simply associating with conspirators is not sufficient to support a conspiracy conviction. See United States v. Barnett, 197 F.3d 138, 146 (5th Cir. 1999). But, association with the conspiracy's members, along with "other circumstantial evidence" may implicate an individual in the conspiracy. See Turner, 319 F.3d at 721.

The jury heard a succession of recorded telephone conversations between the three defendants. During these admittedly truncated conversations, the jury heard the parties discussing the logistics of consummating a transaction that would have had Portillo transport approximately 30 kilograms of cocaine from Chester Ennis' residence in El Paso, Texas to Manhattan. On April 10, 2002, Portillo had a series of conversations with Chester Ennis – some of which also involved William Ennis. During these discussions, Portillo tells Chester that he will be able to leave the following evening --April 11th -- and Portillo, eventually agreed that the date was amenable. William Ennis could be heard in the background when the conversation between Chester and Portillo was taking place.

During the course of the next day, Chester, William, Segura, and Portillo each had conversations amongst one another in an effort to insure that the transaction proceed as planned. For example, Chester and Portillo had a one minute conversation in which Portillo expressed concern about being caught. Portillo told Chester to "[M]ake sure and count everything, I don't want to be responsible . . . [s]eal it up for me" In response, Chester Ennis, appearing to grasp Portillo's concerns responds by stating "yes sir." In a later conversation that same day Portillo tells Chester that "I need

11

to pick up that load," to which Chester responds "Okay." Minutes later Chester calls William informing his son that "Everybody's ready so . . . what do you want to do?" to which William responds "Um, you tell me I've been waiting on you?" During the same conversation Chester asks William if he has made contact with "the short one" -- which was a reference to Segura. William states that he had. Thereafter, Chester asks William, what if anything he knows about a "payment" that was to made. Before William can fully respond, Chester states that he will have to make a call. Minutes later Chester calls Segura, asking, "What did you find our [sic] about the payment?" Segura responds to this inquiry by stating "Ah, I'll call him right now. I've been trying to get a hold of him, I'll call him right now. Ah Billy was [sic] gonna be there with you right now." Additionally, during a telephone conversation later that evening, Segura is heard in the background instructing Chester to tell Portillo that he (Portillo) would receive further instructions once he reached Interstate 87 just outside of Manhattan.

Segura, William and Chester's conversations clearly demonstrates that they were attempting to facilitate the drug transaction, but that the logistics associated with completing it needed to be coordinated – principally related to loading Portillo's vehicle with the drugs as well as insuring that Portillo was paid. In several telephone conversations from April 16th, 2002, upon Portillo's "arrival" in Manhattan, Chester and Segura attempted to provide Portillo with the pager number of Segura's "contact" in Manhattan whom Portillo was supposed to meet. Thus, it was plainly evident that the parties had reached an agreement. Similarly, once Portillo returned to El Paso, he received the final installment of his payment from Segura.

There was also more than sufficient evidence beyond William's telephone conversations, which implicated him in the conspiracy. For example, on April 11, 2002, surveillance showed a male

12

removing a large "white" box from William's jeep, enter into the home of Chester Ennis. Two males then left Chester's home, one carrying the box. An hour or so later, the drugs were loaded in the tractor-trailer. This same box contained the cocaine that was placed in Portillo's tractor-trailer. The significance of the computer box, and its further nexus to William was that a few months earlier he had purchased a computer which had the identical serial number as the box that was used to transport the cocaine. Cf. generally United States v. Hernandez-Bautista, 293 F.3d 845, 853 (5th Cir. 2002) (observing that law enforcement's inability to draw a nexus between the defendant's truck, drugs allegedly stored in the truck, and his co-defendants, was a factor in affirming district court's order granting acquittal on possession with intent to distribute charge).

We also reject the contention that the conduct of the parties was insufficient to rise to the level of affirmative conduct necessary to support a conspiracy conviction. We have previously articulated what might be described as the outer contours of when an individual may be found to be part of a conspiracy in United States v. Torres, 114 F.3d 520 (5th Cir.1997). In Torres, four defendants were convicted in a conspiracy to distribute marijuana. One of the defendants, named Beltran, argued that the government had not produced sufficient evidence to support his conviction for belonging to the conspiracy. We conceded that the evidence against Beltran was somewhat scant, observing that "the prosecution presented evidence which must be deemed as *just barely sufficient*, from which the jury reasonably could have inferred that Beltran was guilty." Id. at 523 (emphasis added). However, we found that there was sufficient evidence to support the conviction, and from which a jury could have reasonably found that Beltran was a conspirator given that: (1) he had attended one meeting with the conspirators in which he did not speak; (2) was present during a second meeting during which he simply nodded his head in assent when discussions of drug

13

trafficking were taking place amongst the other conspirators, and (3) because he told an undercover officer that it was unnecessary to pay him for drugs because he was working in concert with the other conspirators. Id.

The evidence in this case far exceeds that which was held to be sufficient in Torres. Chester Ennis coordinated the conspiracy. Strong evidence was presented which suggested that he loaded the drugs onto Portillo's truck with the assistance of William. Chester had several discussions with both Alberto and William related to coordinating all aspects the conspiracy. He asked his son whether he was aware if Segura had made a payment. There was evidence presented that the cocaine was transported in a box that was delivered to Chester's home from a male who was riding in a jeep belonging William, and using a computer box that had belonged to William. Finally, the jury was presented with evidence that Segura actually made the remaining payment to Portillo.

Accordingly, we find that the evidence presented was sufficient for the jury to ultimately conclude that the three defendant's were deeply involved in a drug conspiracy, particularly stemming from their interactions in and around the days following the April 11, 2002 drug transfer. Consequently, we hold that a rational jury could have found that the necessary elements for conspiring to possess with intent to distribute were present. In accordance, we conclude that no error has occurred and the jury's determinations as to the conspiracy count against all of the defendants are affirmed.

C. **Whether there was sufficient evidence to convict Alberto Segura and William Ennis for aiding and abetting the distribution of cocaine?**

In order to establish that a defendant has aided and abetted a conspiracy to possess with intent to distribute narcotics, the Government is required to show that: (1) the underlying criminal offense

actually transpired and the defendant associated with the undertaking; (2) the defendant willfully participated in the undertaking; and (3) the defendant intended for the undertaking to succeed. See United States v. Garcia, 242 F.3d 593, 596 (5th Cir. 2001). The term "associated" means that the defendants "shared in the criminal intent of the principal," while the term "willful participant" means that the defendants "engaged in affirmative conduct designed to aid the venture." United States v. Pedroza, 78 F.3d 179, 183 (5th Cir. 1996) (citations omitted).

"'The evidence supporting a conspiracy conviction typically supports an aiding and abetting conviction.'" United States v. Tenorio, 360 F.3d 491, 495 (quoting United States v. Montgomery, 210 F.3d 446, 450 (5th Cir. 2000)). Consequently, the evidence that we held to be supportive of the parties' conspiracy convictions, is therefore clearly germane to the question of whether Segura and William's conduct satisfies the elements of an aiding and abetting conviction. We believe that it is fairly obvious that Segura and William shared a mutual criminal intent with Chester. Similarly, the evidence presented also supports that William and Segura were willful participants in this highly coordinated drug trafficking conspiracy, "[g]iven that '[c]oncert of action may indicate . . . voluntary participation' in a drug conspiracy." United States v. Turner, 319 F.3d 716, 723 (5th Cir. 2003) (quoting United States v. Quiroz-Hernandez, 48 F.3d 858, 866 (5th Cir. 1995)). Finally, the degree to which Chester, William, and Segura sought to avoid detection clearly suggests that they intended for the conspiracy to succeed.

Many factors further support affirming the jury's conviction. Segura, paid Portillo the remaining amount of money that he was owed for transporting the 30 kilograms of cocaine. More than sufficient evidence was also presented to suggest to a reasonable jury that William Ennis also directly aided and abetted the conspiracy. He had discussions with Chester regarding making

15

payments to Portillo and highly incriminating circumstantial evidence was presented to suggest that William provided the means for transporting the cocaine to Manhattan. It is also evident that the parties were desirous of the conspiracy's success given the truncated nature of the phone calls (most likely to avoid prolonged exposure to wiretapping), the coded references to the drugs in these conversations, and the succession of phone calls between Chester, William, and Segura regarding the progress of the conspiracy. As such, we believe that their actions are all earmarks of the desire to insure the conspiracy's success, since members of a drug conspiracy must often act in secrecy and with great synchronization in order to achieve their desired ends. See generally, e.g., United States v. Pofahl, 990 F.2d 1456, 1470 (5th Cir. 1993); United States v. Sutherland, 463 F.2d 641, 646 (5th Cir. 1972). Therefore, we conclude that the counts of the indictment related to whether William and Segura aided and abetted the conspiracy must be affirmed.

**D.     Whether there was a prejudicial variance between the indictment which stated that Alberto Segura, Chester Ennis, and William Ennis, were involved in a single conspiracy, and the evidence that was presented at trial which they believe suggested that the parties were involved in multiple conspiracies?**

The defendants aver that they were prejudiced by the Government's presentation of its case -in-chief primarily because there was a material variance between the evidence that was presented at trial and the indictment itself. We proceed with the understanding that a determination as to whether there was "material variance" between the indictment and the proof offered at trial is reviewed for harmless error. See United States v. Lokey, 945 F.2d 825, 832 (5th Cir. 1991). The defendants contend that the Government's case suggested that they were involved in multiple conspiracies. In our assessment of whether the evidence presented established more than one conspiracy, we look to: "(1) whether there was a common goal, (2) the nature of the scheme, and (3) the overlap among the

16

participants in the various dealings." Id. at 831. Our reference to a "common goal" is intended to be read expansively, such that, for example, a generalized conspiracy to distribute narcotics could satisfy this criteria. See United States v. Therm-All, Inc., 373 F.3d 625, 637 (5th Cir. 2004). Similarly, the "nature of the scheme" refers to whether the parties' "agreement contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, [if so,] then such agreement constitutes a single conspiracy.'" Id. (quoting United States v. Morris, 43 F.3d 410, 415-16 (5th Cir. 1995)). The "overlap" prong is intended to encompass those situations where a "ringleader" may control a matrix of narcotics activities involving several associates, who themselves may never interact with any other members of the conspiracy but the central figure. Id. Consequently associates in a much broader conspiracy who have never met, could properly be held to be members of the same conspiracy. See Sigers v. United States, 321 F.2d 843, 846 (5th Cir. 1963).

The defendants believe that due to the Government's conduct, they were prejudiced to such a degree that they are entitled to a new trial. We disagree. We have observed that where a defendant maintains that there was significant variance between the indictment and the proof offered at trial, such variance does not warrant reversal unless it is shown that the accused's substantial rights were affected to some appreciable degree. See United States v. Cyprian, 197 F.3d 736, 741 (5th Cir. 1999) (citing United States v. Pena-Rodriguez, 110 F.3d 1120, 1128 (5th Cir. 1997)). The rationale undergirding our concern against countenancing a material variance between the indictment and the proof offered at trial derives from our apprehension that the accused might be prejudiced in preparing his defense. See United States v. Hernandez, 962 F.2d 1152, 1159 (5th Cir. 1992). Additionally, we also believe that the accused should not be exposed to the troubling specter that even if he

17

successfully defends himself against the specific charges contained in the conspiracy indictment, the jury will nevertheless transfer guilt onto him simply because he at some time interacted with other members of the conspiracy. Id. The determination of whether the prosecution presented proof of a single, or conversely, multiple conspiracies turns on analyzing such factors as: "'(1) the time period involved; (2) the persons acting as co-conspirators; (3) the statutory offenses charged in the indictment; (4) the nature and the scope of the criminal activity; and (5) the places where the events alleged as the conspiracy took place.'" Lokey, 945 F.2d at 833 (quoting United States v. Devine, 934 F.2d 1325, 1333 (5th Cir. 1991)). It is of course permissible for the jury to "draw reasonable inferences from the evidence presented at trial." Id. at 831.

Our analysis of these factors suggests that it was clearly reasonable to conclude that the defendants were members of a single conspiracy to distribute narcotics. It is not necessary for every member of the conspiracy to be intimately involved with all of the particulars of the conspiracy, because, as we have observed, when a defendant works in concert with those who may properly be described as "core conspirators" to effectuate the central objectives of the conspiracy, that person may be characterized as belonging to the conspiracy. See id. at 833. In this instance, the central purpose of the conspiracy was to further distribute narcotics.

It was no great leap for the jury to conclude that Segura and William were deeply involved with Chester Ennis in the distribution of narcotics, and the record certainly supports such findings. We have referenced the degree to which the parties coordinated their activities in the period from April 11 through April 17, 2002. The record does not support the suggestion that there was any material variance between the indictment and the case presented against the respective defendants. And assuming arguendo that there was such variance, there has been no argument made that any of

18

the defendant's substantial rights were contravened to such an extent warranting reversal. The jury heard the tape recorded conversations, principally outlining the nature of the conspiracy. Chester and Segura discussed coordination of a payment that Portillo was to receive. At varying times Segura mentioned the need to get in contact with William in order to secure his assistance with the plot. Moreover, a man was seen leaving William's jeep from the driver's side, carrying a large computer box, which, from aerial surveillance appeared to be white. The box that was removed from the jeep was later used in the transport of approximately 30 kilograms of powder cocaine. The principal harm that we seek to avoid in our material variance analysis is the failure to apprise the defendant of the charges against him and moreover to insure that the case presented by the prosecution is identical to the charges referenced in the indictment. See Lokey, 945 F.2d at 834. Because Chester, William, and Segura were cognizant of the charges against them prior to trial, the trial itself did not offer any surprises in that regard. Clearly then their respective convictions were not premised on facts that could be construed as dissimilar from those articulated in the indictment itself. Id. Therefore, we do not find that there was a material variance warranting a reversal.

Moreover, the defendants, particularly William Ennis, take issue with the instructions that the jury received related to whether or not the evidence presented suggested one conspiracy or multiple conspiracies. When objections are raised related to jury instructions during the course of the trial, they are reviewed by this court for an abuse of discretion, see United States v. Daniels, 281 F.3d 168, 183 (5th Cir. 2002), whereas when no objections are raised, challenges to jury instructions are reviewed for plain error. United States v. Partida, 385 F.3d 546, 559 (5th Cir. 2004). An abuse of discretion is defined as occurring when an error "materially prejudice[s] [the] defendant." United States v. Miller, 513 F.2d 791, 793 (5th Cir. 1975). "Plain error is defined as (1) an error; (2) that

19

is clear or plain; (3) that affects the defendants' substantial rights; and (4) that seriously affects the fairness , integrity, or public reputation of the judicial proceeding." United States v. Vasquez, 216 F.3d 456, 459 (5th Cir. 2000). Under either standard of review, we find that the instructions as presented to the jury were neither materially prejudicial, nor compromised the basic integrity of the proceeding, given the overwhelming facts presented in this case. Accordingly, we find the contentions related to the instructions received by the jury to be without merit.

**E.     Whether the district court erred by denying William Ennis' motion for a mistrial following the inadvertent destruction of the Gateway computer box?**

William contends that the district court erred when it denied his motion for a mistrial because courthouse cleaning personnel inadvertently destroyed the Gateway computer box that was used to carry the 30 kilograms of cocaine from Chester's El Paso residence to Manhattan. A determination regarding whether the denial of a motion for a mistrial was in error, is reviewed for an abuse of discretion. See United States v. Coveney, 995 F.2d 578, 584 (5th Cir. 1993). A defendant's due process rights are implicated in an instance when evidence becomes lost *prior* to trial, if the defendant establishes: (1) the government acted in bad faith; (2) the evidence is material in the sense that its exculpatory character was self-evident prior to being lost; and (3) as a consequence of the missing evidence the defendant is unable to prove his innocence. See United States v. Thompson, 130 F.3d 676, 686 (5th Cir. 1997); see also California v. Trombetta, 467 U.S. 479, 489 (1984) (discussing when lost evidence should be construed as material to the defense).

We are not dealing with a situation wherein the government should be held liable for the missing evidence, or be found to have acted in bad faith. Instead, we confront an issue of apparent first impression, regarding the degree to which a defendant's due process rights are infringed when

20

evidence that was presented during the course of trial, but was lost while the jury was engaged in its deliberations, warrants a new trial.

Following the first day of the jury's deliberations, it was brought to the court's attention that some of the boxes that the Government argued were used by the defendants to transport marijuana and cocaine -- including the Gateway computer box -- were lost. The judge informed the jurors that the boxes were missing and that once more information became available he would inform the jurors. After further deliberations, the jury sent a note to the judge informing him that they had reached verdicts as to two of the defendants -- Chester and Segura-- but that they had reached an impasse regarding two counts against William, and that they needed direction as to how they were to proceed. Moreover, the jury asked the judge if they could view the boxes during their remaining deliberations. The judge explained to the jury what had occurred with the boxes, and instructed the jury "to recall all testimony relative to those exhibits and [to] assign such weight and value to that testimony as you deem appropriate." This instruction was memorialized, and signed by the judge, the government, and counsel for all three defendants. Shortly, after receiving the instruction, the jury found William guilty of all the counts against him.

We believe that it is relevant that the jury had the Gateway box before it throughout the entire trial and had it in the jury room during the first day of its deliberations. There has been no demonstration that if the jury had the Gateway box throughout its entire deliberations that this would have proven beneficial to William. See generally United States v. Villalon, 605 F.2d 937, 938 (5th Cir. 1979) (observing that evidence that is not beneficial to the defense does not necessarily have to be preserved). Our review of the record indicates that rather than being exculpatory, it would have tended to inculpate William. Again, recall that the jury heard testimony of how he purchased a

21

computer some months earlier. The box that the computer was contained in was the same box that the cocaine was transported in. William's jeep pulled into Chester's residence shortly before 6:00 p.m. on April 11, 2002. A male exited William's jeep carrying what appeared from aerial surveillance's perspective to be a white-looking box. William's counsel makes much of the fact that the Gateway box's exterior was actually white and black, similar to a Holstein cow. However, it should also be recalled that the box was being surveilled from some distance, so the lack of exactitude regarding the box's exterior is far from fatal. More than an hour later, the box was then loaded onto Portillo's tractor-trailer. Thus, we do not see how the absence of the Gateway box implicated William's due process rights, and if anything, had the box been present throughout the entire deliberations this would have proven to detrimental to his defense. Accordingly, we hold that the district court did not err by denying the motion for a mistrial.

## IV.  CONCLUSION

We conclude that the jury was presented with sufficient evidence to find the defendants guilty as to all the counts charged in the indictment. Accordingly, each conviction is affirmed.

AFFIRMED.